**In re Carl D. MATHENIA, Debtor.**

**Bankruptcy No. BK–97–20509–LN.**

United States Bankruptcy Court,
W.D. Oklahoma.

April 24, 1998.

Joseph W. Farber, Oklahoma City, OK, for debtor.

Letha F. Sweeney, Oklahoma City, OK, for Standing Chapter 13 Trustee.

## ORDER ON CHAPTER 13 TRUSTEE'S OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN

PAUL B. LINDSEY, Bankruptcy Judge.

### BACKGROUND

Debtor commenced this case on October 17, 1996, by filing his voluntary petition under Chapter 13 of the Bankruptcy Code.[1] In the Chapter 13 plan which accompanied his petition, debtor proposes 36 monthly plan payments of $160.50. The plan would pay $78.61 monthly to Oklahoma Gas & Electric Company ("O.G. & E.") as ongoing payments on a debt secured by a heat pump, and $8.98 per month to cure an arrearage of $314.44 on that debt. Debtor's counsel would be paid $1,400.00 through the plan. It is contemplated that after these payments and the payment of Trustee fees, the holders of unsecured claims, if timely proofs of claim are filed by all, would receive a distribution of $656.12, or 7% of their claims.[2]

Debtor's schedules disclose that debtor's household consists of himself, his spouse, who is not a debtor herein, and two minor children. Debtor's monthly net income is $1,089.79, and that of his spouse is $1,052.83, a total of $2,142.62. The monthly living expenses for the family are scheduled at $1,982.12, including a $439.12 payment on the 1984 Isuzu Rodeo vehicle (the "Rodeo") driven by debtor's spouse.

The Rodeo was not included in debtor's schedules. At the § 341 meeting of creditors, held November 26, 1997, debtor testified that he was surrendering his interest in the vehicle and that it would be paid for in full by his spouse, and not through the Chapter 13 Trustee (hereafter, "the Trustee").

On December 11, the Trustee filed her objection to confirmation of debtor's Chapter 13 plan. In her objection, the Trustee asserts that the plan fails to provide that all of debtor's projected disposable income will be applied to make payments under the plan.[3] She also contends that the plan unfairly discriminates against a class of creditors, i.e., the holders of non-priority unsecured claims, in violation of § 1322(b)(1).[4]

After a hearing on confirmation, held January 20, 1998, the parties were directed to files briefs by March 2, 1998, with replies, if desired, to be filed by March 12, 1998. The issues were taken under advisement, to be determined on the record and the briefs of the parties. Debtor and the Trustee each filed a brief on March 2, 1998, and the Trustee filed her reply on March 12, 1998. The issues are therefore ripe to be determined.

### THE BRIEFS

**Debtor:**

Debtor's submission is entitled "Brief Supporting Payment Of Non–Debtor Spouse'

---

1. References herein to statutory provisions by section number only will be to provisions of the Bankruptcy Code, 11 U.S.C. § 101 et seq., unless the context requires otherwise.

2. In determining the feasibility of Chapter 13 plans, Trustee fees are estimated at 10% of amounts received by the Trustee, the maximum permitted under 28 U.S.C. § 586(e)(2). In fact, these fees are, and traditionally have been, set at an amount significantly less than the maximum. Since they are subject to periodic adjustment, upward or downward, however, the feasibility computation is made based upon the statutory maximum.

3. Section 1325(b) provides, in material part, as follows:

    (b)(1) If the trustee ... objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
    \*\*\*
    (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.
    (2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
    (A) for the maintenance or support of the debtor or a dependent of the debtor....

4. Section 1322(b)(1), which allows the plan to designate a class or classes of unsecured claims, as in a Chapter 11 case, provides that it "may not discriminate unfairly against any class so designated...."

Vehicle Outside Chapter 13 Plan," and addresses that issue only. Three hypothetical examples are given, each assuming monthly family income of $1,000, expenses of $900, including a $200 per month car payment on the $3,000 secured debt against the non-filing spouse's vehicle, and a 10% Trustee fee: (1) A 36-month plan with payments of $100, the non-filing spouse's car payment being made through the budget and not through the plan; (2) a 36-month plan with payments of $300, the car payment being made through the plan; and (3) a 43-month plan with payments of $300, the car payment being made through the plan.

In the first example, debtor contends that the plan is feasible and it is anticipated that the holders of allowed unsecured claims would receive a distribution of approximately 8%. In the second, it is contended that the plan is infeasible due to the increased Trustee fees, and that extension of the term of the plan is the only solution. In the third example, the plan is extended to 43 months, assertedly in order to make it feasible, and it is anticipated that the holders of allowed unsecured claims would receive a minimal distribution.

Debtor next purports to apply the examples to this case, and asserts that if the $439.12 Rodeo payment were removed from the family budget and added to the payments to the Trustee, the plan would have to extend to 79 months in order to provide even a minimal distribution to holders of unsecured claims, and that this result is necessitated by the increased Trustee fees. It is further asserted that the plan, if limited to 60 months in length, the statutory maximum under § 1322(d), would be feasible only if the plan payment was increased by an additional $8.00 per month, and that it would then provide for only a minimal distribution to holders of unsecured claims. In both the 79-month and the 60-month scenarios, debtor's calculations assume that the cure of the arrearage to O.G. & E., and the attorney fees, would be spread over the life of the plan.

Debtor's brief consists primarily of arguments in favor of permitting the Rodeo payment to be made outside his plan. It also contains comments on the asserted universal adverse effect of Trustee's fees in Chapter 13 cases on distributions to unsecured creditors, while giving brief lip service to the dependence of the Chapter 13 system upon those fees.[5] It also contains a condemnation of the "impossible situation" in which a debtor is placed when seeking automobile financing immediately after a Chapter 7 filing.[6]

Debtor relies upon *Matter of Harris,* 107 B.R. 204 (Bankr.D.Neb.1989), in which the court announced eight factors to be considered, in addition to the avoidance of Trustee fees, in determining whether payment of a debt outside a Chapter 13 plan should be permitted. Debtor concludes that his proposed plan "is consistent with the law and, simply put, is a better way of doing it for all concerned." [7]

### The Trustee—Initial Brief:

Trustee points out that debtor and his non-filing spouse provide 51% and 49%, respectively, of the monthly net income of the family, and asserts that debtor is subsidizing his spouse at the expense of his unsecured creditors by paying more than his pro rata share, based upon those percentages, of family living expenses, in order for her to be able to make the Rodeo payments out of her income.[8]

Trustee also argues that the purchase of the Rodeo was not necessary and, apparently, that permitting it to be paid for by the non-filing spouse would constitute unfair discrimination against debtor's unsecured creditors. Finally, she contends that permitting payments to be made outside Chapter 13 plans threatens to jeopardize the integrity of the Trustee system. As an example, she asserts that when control of payments made to creditors is not within the hands of the

---

5. *See* debtor's brief, at pgs. 4–7.

6. *Id.,* n. 2, at pg. 6.

7. *Id.,* at pg. 7.

8. The percentages shown result from rounding to the nearest full percent. Computations contained in the balance of this order have been made using exactly 51% and 49%.

Trustee, certification of payment in full upon closing of cases will be rendered impossible.

### The Trustee—Reply Brief:

Trustee argues, in effect, that the purchase of the Rodeo, in the circumstances under which the purchase took place, calls into question the debtor's good faith in proposing his plan. She again argues that debtor is diverting his disposable income and reducing the amount to be paid to his unsecured creditors in order for the payment on the vehicle to be made directly by his spouse. Conceding that payment outside the plan would be beneficial to debtor by reducing Trustee fees, the Trustee concludes by asserting that to allow this to occur could jeopardize the ability of the Trustee to operate.

### DISCUSSION

■ Debtor consistently refers to the debt on the Rodeo as one on which he is not the "principal beneficiary." First, this court finds no legal significance in being, or not being, a "beneficiary" of an obligation. Debtor apparently contends that the Rodeo belongs to his spouse, and that therefore he should not be required to acknowledge any ownership interest in it or be burdened with any obligation to pay for it. In this case, however, it is clear that he is jointly obligated with his spouse on the indebtedness to which the Rodeo is subject, having jointly executed the Retail Installment Sales Contract and Security Agreement under which it was purchased. It also appears that the Rodeo is titled in the name of both debtor and his spouse.

Debtor asserted in his brief that his spouse was forced to surrender her vehicle in a Chapter 7 bankruptcy case filed on June 13, 1997. As is noted above, he also complains, somewhat bitterly, about the plight of debtors requiring automotive financing *after* a Chapter 7 filing. In fact, the record reveals that the Rodeo was purchased by debtor and his spouse jointly on June 2, 1997, 11 days *before* the spouse filed her petition in bankruptcy. Logic compels the conclusion that the transaction was entered into in anticipation of bankruptcy, not as a result of it.

In her bankruptcy, debtor's spouse reaffirmed the obligation on the vehicle, in the amount of $18,688, even though according to debtor the vehicle then had a book value according to the National Association of Automobile Dealers (NADA) guide of only $11,862. While debtor was not a debtor in bankruptcy at that time, and therefore not a party to the reaffirmation agreement executed by his spouse, her bankruptcy did not affect his liability on the original indebtedness. Debtor treats the Rodeo loan as an obligation cosigned with his spouse.[9] In fact, however, debtor and his spouse are liable to the creditor under separate obligations, he on the original installment sales contract and she on the reaffirmed debt. Both are nevertheless liable, and the vehicle is subject to the creditor's lien under both obligations. The creditor may look to either obligor, and to the vehicle, for satisfaction of the indebtedness owed to it.

■ It should be noted that the court finds certain of the Trustee's contentions to be without merit, and further questions a long-standing policy of the Trustee. First, while certification of payment in full by the Trustee upon completion of a plan and in anticipation of closing is important, such certification is not a factor in connection with the obligation which is secured by the Rodeo. That obligation is a long term debt which will not be paid in full during the term of the plan. It will be maintained by the regular monthly payment, as is permitted by § 1322(b)(5). Such a debt is specifically excepted from discharge at the completion of plan payments by § 1328(c)(1). The Trustee, prior to closing the case, is therefore not required to consider, report, or even necessarily have any knowledge of, the extent to which the debt has been paid.

Second, this court questions the applicability of § 1322(b)(1) to the circumstances present in this case. Debtor has not designated a class or classes of unsecured claims, as is contemplated by that provision. Since all of

9. It is not clear why debtor refers to the debt as a cosigned debt. That category of debt has significance only under § 1322(b)(1) in permitting different treatment for *unsecured* consumer debts which are cosigned.

the unsecured claims are in a single class, no separate class having been designated, it does not appear that it would be possible for debtor's plan to discriminate unfairly against a class "so designated."

Finally, the policy issue. In this district, the Trustee has long had a policy of permitting debtors to make home mortgage payments directly, rather than through the Trustee, when the obligation is not proposed to be modified and is current at the time of filing of the bankruptcy petition. The theory, presumably, is that since in most cases the obligation will not be paid in full during the term of the plan and therefore will not be discharged at the conclusion of the case, and since the obligation is current, there is no necessity for the Trustee to monitor future payments. Further, the mortgagee is almost certainly capable of protecting its own interests in the event of a future default.

Home mortgage payments are generally debtors' most substantial ongoing payment obligations, and if made through the Trustee, would require the payment of significant Trustee fees. The Trustee's policy in this regard relieves debtors of the necessity to pay these fees, thus making it less burdensome to propose and complete their Chapter 13 plans. With this policy, this court is in full agreement.

The Trustee, however, has never agreed to the confirmation of plans proposing the direct payment of other long term obligations, such as car payments.[10] Perhaps, as the Trustee contends here, she fears that extending the policy to other debts would establish a dangerous precedent and encourage manipulation of transactions, schedules and proposed plans so as to reduce the payment of Trustee fees to a point that the viability of the Chapter 13 program would be threatened. In this court's view, such fears are groundless. One of the principal benefits of Chapter 13 is the "cram down" option, pursuant to which a debtor may agree to pay the holder of an allowed secured claim only the value of the collateral, with interest, irrespective of the actual principal amount of the obligation.[11] With rapidly depreciating collateral, such as vehicles, this option is particularly attractive, and it is used with great frequency. As a result, a Chapter 13 plan proposing to pay an obligation on a vehicle in accordance with its terms and without modification is rather rare.

The cost of automobiles has increased substantially in recent years, as of course have the amounts required to lease them or to finance their purchase. This court fails to see the logic of permitting the direct payment by debtors of current, unmodified obligations on home mortgages while requiring payment of current, unmodified obligations on other collateral to be made through the Trustee, particularly in cases where, as here, such payments will not be completed during the life of the plan, and where personal liability on the debt therefore will not be discharged at the completion of the plan.

The Trustee contends that debtor is not devoting all of his disposable income to the plan. This contention is based upon her assertion that when spouses are both employed, but only one is a debtor in bankruptcy, it may be assumed for purposes of the disposable income computation that each contributes to family living expenses in the same proportion that his or her income bears to the total family income. In this case, the monthly net income of debtor and his spouse represent 51% and 49% of the $2,142.62 family total, respectively. After deduction of the $1,982.12 scheduled family monthly expenses, which includes the $439.12 Rodeo payment, the family's "disposable income" would be $160.50. Under the Trustee's formula, the proportionate share of that amount attributable to debtor and his spouse would be $81.86 and $78.64, respectively. It is noted, however, that debtor proposes to devote the entire $160.50 to Chapter 13 plan payments.

10. It is noted that the Trustee frequently does not object to car payments being made outside the plan if they are incurred post-confirmation after modification of the plan. Why such an obligation should be treated differently is not at all clear.

11. The "cram down" option is not available where the claim is secured only by a security interest in real property which is the debtor's principal residence. *See* § 1322(b)(2).

The Trustee asserts that the scheduled family monthly expenses must be reduced by the Rodeo payment, since it is proposed to be paid entirely by debtor's spouse. This would reduce the expenses to $1,543.00 and increase the total family disposable income, before the Rodeo payment, to $599.62, of which $305.81 would be attributable to debtor and $293.81 to his spouse. Obviously, neither debtor nor his spouse would have sufficient disposable income to make the Rodeo payment alone. The Rodeo payment of $439.12 would require $145.31 more than the amount of disposable income which would be available to debtor's spouse, and she would therefore not be able to make that payment out of her own funds, as debtor's plan proposes. The Trustee's conclusion is that debtor would be required to subsidize his spouse by $145.31 per month, which amount should instead be made available through his plan for the benefit of his unsecured creditors.

As is noted above, debtor's plan proposes to continue ongoing monthly payments of $78.61 to O.G. & E., to cure an arrearage with O.G. & E. with monthly payments of $8.98, and to pay attorney fees of $1,400.00 over the life of the 36–month plan, an average payment of $38.89. Assuming a 10% Trustee fee, the payment of these obligations through the Trustee would require plan payments of $139.13 per month ($126.48 plus a $12.65 Trustee fee). Debtor's proposed plan payment of $160.50 would leave $21.37 per month for unsecured creditors. Had debtor proposed plan payments of $81.86, his proportionate share of the family's disposable income, rather than the $160.50 which represents the entire family's disposable income, the payment would have been insufficient to cover the debts sought to be paid through the plan, and the plan would not have been feasible.

Reducing the family's expense budget by the amount of the Rodeo payment and requiring that payment to be made through the Trustee would increase the family's disposable income from $160.50 to $599.62, and the amount required to be paid in plan payments from $139.13 to $622.16 (assuming a 10% Trustee fee of $43.91 on the $439.12 Rodeo payment). Debtor's share of the $599.62 would be $305.81. His proportionate share of the Rodeo payment and the Trustee fee on it would be $246.35. Added to the $139.13 required to be paid on the other obligations, which are payable by debtor alone, the total of $385.48 would be $79.67 more than debtor could pay. Thus, a 36–month plan would not be feasible. It is noted that even if the Rodeo payment were proposed to be made directly, without a Trustee fee, to which this court in these circumstances would not object, the $22.39 per month proportionate saving to debtor (51% of the $43.91 Trustee fee) would still not make the plan feasible. This analysis makes it clear why debtor structured his plan as he did, with the Rodeo payment being made directly in the budget (ostensibly to be paid by debtor's spouse), and why debtor proposed to devote both his and his spouse's share of the family disposable income to the plan.

Thus, debtor's plan, structured as it is, is not feasible unless debtor employs a portion of his spouse's proportionate share of the family's disposable income. In this court's view, debtor can not propose a confirmable plan which includes continuing to make the Rodeo payment, as no such plan would be proposed in good faith.

The records of this court disclose that debtor filed a Chapter 7 bankruptcy case in 1993, No. 93–11342–BH and obtained a discharge on June 24, 1993. Debtor's spouse filed her Chapter 7 case, No. 97–15832, on June 13, 1997, immediately after she and debtor purchased the Rodeo, and obtained a discharge on October 2, 1997. Debtor filed this Chapter 13 case 15 days later, four months and four days after debtor's spouse filed her Chapter 7 petition.[12] In the 1993 Chapter 7 case, debtor scheduled nonpriority unsecured claims in the amount of $35,009.30, of which approximately $33,000 represented a deficiency claim on a townhouse which had been foreclosed. In her 1997 Chapter 7 case,

---

**12.** Section 727(a)(8) prevents a debtor from obtaining a discharge in a Chapter 7 case if he or she has been granted a discharge in a previous Chapter 7 case which was commenced within six years before the date of the filing of the petition. Section 1328 contains no such restriction upon a subsequent discharge in a Chapter 13 case.

debtor's spouse scheduled nonpriority unsecured claims in the amount of $11,068.87. Each of those Chapter 7 cases was treated as a "no asset" case, and no distribution to unsecured creditors was made in either case. In this Chapter 13 case, debtor scheduled nonpriority unsecured claims in the amount of $5,939.36.[13]

As is noted above, debtor and his spouse jointly purchased the Rodeo only days before the spouse filed her Chapter 7 petition. They made a $2,500.00 cash down payment, traded in a vehicle worth $6,600, the amount of the debt against it, purchased an extended warranty for $1,495.00 and financed the balance, $18,597.50, agreeing to make payments of $439.12 for 72 months. In the Chapter 7 case, debtor's spouse reaffirmed her obligation on the debt in full. This is not surprising, since the purchase of the vehicle almost literally on the eve of bankruptcy could very well have been the basis of an adversary proceeding seeking to except the debt from her discharge under § 523(a)(2).[14] Debtor's petition under Chapter 13 in this case was filed four months and four days after his spouse filed her Chapter 7 petition.

As a result of this series of events, which appear to have been carefully orchestrated, debtor and his spouse have discharged over $46,000 in nonpriority unsecured obligations in their two Chapter 7 bankruptcy cases filed in 1993 and 1997. If debtor's proposed Chapter 13 plan was confirmed and completed, debtor would discharge additional nonpriority unsecured debts in an amount of at least $6,000 and perhaps more than $9,000. At the same time, debtor and his spouse will have disposed of a vehicle worth some $6,600, the amount owed against it. They will have paid $2,500 in cash as a down payment on a replacement vehicle valued at more than $19,000, which they clearly could not afford.

They will have purchased a $1,500 extended warranty on that vehicle and financed the balance of almost $19,000 on a 6–year obligation. Collectively, in three bankruptcy cases, they will have paid less than $700 to their unsecured creditors.

These are not the honest but unfortunate debtors which the Bankruptcy Code was designed to protect and to provide with a "fresh start." These debtors could be the poster children for the standard creditors' argument, to which this court does not subscribe, that bankruptcy is too easy, is constantly taken advantage of by unscrupulous debtors, and operates against the interest of society in general, not to mention creditors in particular.

This court continually hears from debtors' counsel the argument that debtors cannot survive without the new, or late-model vehicle which they have recently purchased and which they propose to retain in Chapter 13 cases at the expense of their unsecured creditors. In many cases, this argument is the equivalent of that made by the individual who killed his parents and begged for mercy because he was an orphan.[15] It is simply not right for debtors to voluntarily obligate themselves for the purchase of property which they clearly can not afford, whether or not in anticipation of bankruptcy, and then expect to retain the property and force their unsecured creditors to pay for their folly, or their guile, as the case may be, by having their claims discharged, in whole or in material part, in a subsequent bankruptcy.

For the reasons set forth herein, the Chapter 13 plan proposed by debtor will be denied confirmation. A hearing will be held before this court at 9:30 a.m. on May 4, 1998, in its 6th Floor courtroom, 215 Dean A. McGee Avenue, Oklahoma City, Oklahoma, at which

13. Debtor contends that his plan would pay $656.12, or 7%, to unsecured creditors. In fact, $656.12 constitutes 7% of $9,373.14. Debtor scheduled no priority or other unsecured claims. No explanation for this discrepancy has been found.

14. Section 523(a)(2) excepts from a debtor's discharge debts obtained by false pretenses, a false representation, actual fraud, or the use of a false financial statement.

15. This is by no means the case with all debtors. In this case, however, no indication whatever has been given that debtor, or his spouse, has experienced any substantial change in circumstances which would justify the result sought here. In fact, the timing of the purchase of the Rodeo would appear to preclude any justification, or any explanation other than that which the court draws by implication.

debtor may show cause why his case should not be dismissed, should he choose to do so. In the absence of any such showing satisfactory to the court, the case will be dismissed immediately at the conclusion of that hearing.

IT IS SO ORDERED.