**In re Kerry L. (Lynn) KEFFER, Donna G. (Gay) Keffer, Debtors.**

**Bankruptcy No. 2–88–00534.**

United States Bankrutpcy Court, S.D. Ohio, E.D.

June 9, 1988.

**510**

Mitchel D. Cohen, M.D. Cohen Co., L.P.A., Columbus, Ohio, for debtors.

Norman M. Frank, Norman M. Frank Co., L.P.A., Columbus, Ohio, for Credithrift of America, Inc.

Frank M. Pees, Worthington, Ohio, Chapter 13 Trustee.

Charles M. Caldwell, U.S. Dept. of Justice, Columbus, Ohio, Asst. U.S. Trustee.

### OPINION AND ORDER OVERRULING OBJECTION TO CONFIRMATION

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court upon an objection to confirmation of the Chapter 13 plan proposed by Kerry L. Keffer and Donna G. Keffer. The objection was filed by Credithrift of America, Inc. ("Credithrift") and presented at the hearing held to consider confirmation of debtors' plan. The parties were granted seven (7) days from the confirmation hearing to file post-hearing briefs. Upon the filing of post-hearing briefs the record was closed and this matter was taken under advisement by the Court.

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which the Court may hear and determine. 28 U.S.C. § 157(b)(1), and (b)(2)(L). The following opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

Credithrift argues that the debtor's plan runs afoul of 11 U.S.C. § 1325(a)(3) in that it was not proposed in good faith. That contention is predicated upon the fact that Mr. Keffer "pawned" various items of personal property—a guitar, "P.V. Head" and speaker cabinet (the "Collateral")—which secured Credithrift's loan to the debtors. The total value of the Collateral which was pawned by Mr. Keffer approximates $750. Credithrift posits that, in view of Mr. Keffer's unauthorized disposition of the Collateral, the plan's proposal to pay a ten percent (10%) dividend to holders of allowed unsecured claims was made in bad faith and, thus, violates 11 U.S.C. § 1325(a)(3). Credithrift also argues that debtors' plan fails to satisfy the terms of 11 U.S.C. § 1325(a)(5)(B) in that it does not provide a market rate of interest on the claims of those secured claimholders that have rejected the plan.

Credithrift relies heavily on the Sixth Circuit's decision in *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982), as support for its objection. In *Memphis Bank*, the court of appeals reversed and remanded the district court's decision, which had affirmed the decision of the bankruptcy court. Although the bankruptcy court's written opinion differed significantly from its oral decision, and was not clear to the Sixth Circuit in several respects, the bankruptcy judge apparently intended to require full payment to the lender under the original contract based upon the debtor's puffing of her income on a loan application. The Sixth Circuit concluded that where the debtor's pre-plan conduct in incurring debt is "dishonest" the bankruptcy court should deny confirmation. 692 F.2d at 432. Where the pre-plan conduct of the debtor is merely "questionable," however, the Sixth Circuit stated that one way to deal with the problem is to require full payment in accordance with the contract. *Id.* Credithrift submits that Mr.

Keffer's conversion of the Collateral would render debtors' obligation to Credithrift nondischargeable in a Chapter 7 case pursuant to 11 U.S.C. § 523(a)(6). From this starting point, Credithrift reasons that, because debtors' obligation would be nondischargeable in a Chapter 7 case, the debt necessarily arises from "dishonest" or "questionable" conduct on debtors' part. Hence, *Memphis Bank* mandates that the Court deny confirmation of the debtors' plan, argues Credithrift, or, alternatively, require full payment on its unsecured claim as well as its secured claim.

Credithrift's argument is flawed in several respects. First, as debtors ably argue in their post-hearing brief, Mr. Keffer's disposition of the Collateral does not definitively establish that the debtors' obligation to Credithrift would be nondischargeable in a Chapter 7 case. In order to support a finding of nondischargeability under 11 U.S.C. § 523(a)(6), the Court must be convinced that a debtor's conversion of property constituted a willful and malicious injury. In *Firstmark Financial Corp. v. Aldrich (In re Aldrich)*, 37 B.R. 860, 864 (Bankr.N.D.Ohio 1984), the court defined a "willful and malicious injury" under 11 U.S.C. § 523(a)(6) as follows:

> [T]his court holds that in the context of a debtor who sells encumbered property prior to bankruptcy, "willful and malicious injury" means a deliberate or intentional act in which the debtor knows his act would harm the creditor's interest and proceeds in the face of that knowledge. The debtor's knowledge may be inferred from his experience in business, his concealment of the sales, his admission that he had read the security agreement which forbade the sale or that he understood what was meant by the term security agreement and collateral used as security. *In re Ries*, 22 B.R. 343, 347 (Bankr.W.D.Wisc.1982); *In re Klix*, 23 B.R. 187, 7 CBC2d 276, 289 (Bankr.E.D. Mich.1982); *In re Donofrio*, 19 B.R. 734, 736 (Bankr.W.D.Ohio 1982); *In re Scotella*, 18 B.R. 975, 977 [8 B.C.D. 1192] (Bankr.N.D.Ill.1982). A merely technical or innocent conversion, or one under mistake, absent aggravated features does

not strictly constitute "willful and malicious injury." *Davis v. Aetna, supra* [293 U.S. 328 at 153, 55 S.Ct. 151] at 153 [79 L.Ed. 393] (1934).

This Court adopted that definition in *Columbus Municipal Employees Federal Credit Union v. Moore (In re Moore)*, 87 B.R. 499, 502–03 (Bankr.S.D.Ohio 1988) (quoting *Aldrich*, 37 B.R. at 864).

Applying the *Aldrich* definition to the facts here, the Court is unable to conclude that debtors' obligation to Credithrift would necessarily be deemed nondischargeable in a Chapter 7 case. No evidence was adduced to establish that Mr. Keffer "had read the security agreement which forbade the sale of the collateral or that he understood what was meant by the term security agreement and collateral used as security." *Aldrich*, 37 B.R. at 864. *See also, In re Scotella*, 18 B.R. 975, 977; *In re Donofrio*, 19 B.R. 734, 736 (Bankr.W.D.Ohio 1982); *In re Ries*, 22 B.R. 343, 347 (Bankr.W.D. Wisc.1982) *In re Klix*, 23 B.R. 187 (Bankr. E.D.Mich.1982). Nor is there any evidence that Mr. Keffer knew his act would harm Credithrift's interest, and that he proceeded to sell the Collateral in the face of such knowledge. In short, under the standards enunciated in *Moore* and *Aldrich*, the limited record before the Court simply does not support the conclusion that debtors' obligation to Credithrift would be found to be nondischargeable in a Chapter 7 case. Hence, the initial premise of Credithrift's argument—that Mr. Keffer's conduct is either "dishonest" or "questionable" because debtors' obligation to Credithrift would be nondischargeable in a Chapter 7 case—is faulty and must be rejected.

In addition, the Court finds that Credithrift's reliance upon *Memphis Bank* as establishing an immutable rule requiring full payment of claims incurred through a debtor's questionable conduct is misplaced. The Sixth Circuit has recently clarified its *Memphis Bank* holding in *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030 (6th Cir. 1988). In *Okoreeh–Baah*, the debtors obtained a $3,300 loan from a credit union in

order to purchase a 1983 Volvo. The debtors had previously borrowed $8,000 from the credit union, which loan was perfected by the notation at the lienholder's name on the title of a 1981 Oldsmobile. In extending the second loan to the debtors, the credit union released the lien on the Oldsmobile and expected that debtors would independently record the title to the Volvo and have the credit union's lien noted thereon. Shortly thereafter, debtors' financial difficulties forced them also to borrow money from a bank, using the same Volvo and other property as collateral. Within six months of the date that debtors obtained their loan from the bank, they informed the credit union that they (the debtors) had failed to perfect the credit union's lien on the Volvo, and that it had been pledged as collateral on the bank loan. Approximately four months later, debtors filed their Chapter 13 petition.

Debtors' Chapter 13 plan, which provided for less than a 100% dividend to holders of allowed unsecured claims, was denied confirmation by the bankruptcy court. The court's decision, which was affirmed by the district court, interpreted the *Memphis Bank* opinion to mandate two requirements: that if a debtor's pre-plan conduct is found to be "questionable" (not dishonest), then a requirement of repayment to the creditor automatically takes effect without evaluation of the debtor's other, possible mitigating circumstances; and second, that the required repayment, once questionable conduct is found, must constitute 100% of the debt, and no less. It was the bankruptcy court's opinion that consideration solely of a debtor's pre-plan conduct, and not his total circumstances, was required by *Memphis Bank.*

In reversing the district court, the *Okoreeh–Baah* court clarified its ruling in *Memphis Bank,* stating as follows:

It seems clear that this court did not mean to adopt a rule requiring 100% payment any time "questionable pre-plan conduct" exists, without analyzing any of the debtor's other circumstances. Indeed, if the Sixth Circuit had intended to announce a test using "questionable preplan conduct" as its only balancing factor, this court certainly would not have cited *Matter of Kull,* 12 B.R. 654 (S.D.Ga.1981), *aff'd sub nom. In re Kitchens,* 702 F.2d 885 (11th Cir.1983), in support of its position. The *Kull* court held that "good faith" required a subjective analysis of the "totality of the debtor's circumstances," and listed a variety of factors "which the bankruptcy court must consider, but not be limited to" when decided whether to confirm a debtor's bankruptcy plan.

. . . .

It is apparent to us that this court in *Memphis* was merely offering possible avenues of recourse to courts dealing with debtors who have engaged in dubious pre-plan conduct.

. . . .

The cases applying the principle set forth in *Memphis* emphasize that a debtor's pre-petition conduct is but one element in the debtor's total circumstances; the good faith calculus requires the use of discretion by the bankruptcy judge.

. . . .

Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment.

Accordingly, we hold that *Memphis* did not establish a *per se* rule, and that courts should take into account the totality of the circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a Chapter 13 plan.

836 F.2d at 1032–34 (footnotes omitted).

In espousing a good faith analysis which looks to the "totality of the debtor's cir-

cumstances," the Sixth Circuit embraced the twelve-factor inquiry postulated by the bankruptcy court in *Matter of Kull,* 12 B.R. 654 (Bankr.S.D.Ga.1981). *Okoreeh–Baah,* 836 F.2d at 1032 n. 3. The factors listed by the *Kull* court include the following:

> (a) the amount of income of the debtor and the debtor's spouse from all sources;
>
> (b) the regular and recurring living expenses for the debtor and his dependents;
>
> (c) the amount of the attorney's fees to be awarded in the case and paid by the debtor;
>
> (d) the probable or expected duration of the Chapter 13 plan;
>
> (e) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
>
> (f) the ability of the debtor to earn and the likelihood of future increase or diminution of earnings;
>
> (g) special situations such as inordinate medical expense, or unusual care required for any member of the debtor's family;
>
> (h) the frequency with which the debtor has sought relief under any section or title of the Bankruptcy Reform Act or its predecessor's statutes;
>
> (i) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;
>
> (j) whether the amount or percentage of payment offered by the particular debtor would operate or be a mockery of honest, hard-working, well-intended debtors who pay a higher percentage of their claims consistent with the purpose and spirit of Chapter 13;
>
> (k) the burden which the administration of the plan would place on the trustee; and
>
> (*l*) the salutary rehabilitative provisions of the Bankruptcy Reform Act of 1978 which are to be construed liberally in favor of the debtor.

*Kull,* 12 B.R. at 659.

■ As the decision in *Okoreeh–Baah* illustrates, a *per se* rule requiring full re-payment of obligations arising from a debtor's questionable pre-plan conduct has not been adopted in this Circuit. Instead, the Court's good faith inquiry must encompass the totality of the circumstances. Here, an analysis of the totality of the circumstances does not mandate denial of confirmation of debtors' plan or full repayment of Credithrift's allowed unsecured claim. The discussion above demonstrates the lack of evidence establishing conduct which would give rise to a finding that debtors' obligation to Credithrift would be nondischargeable in a Chapter 7 case. Further, even if Mr. Keffer's disposition of the collateral constituted "questionable conduct" within the meaning of *Memphis Bank,* it is apparent that other compelling factors are present in this case which militate strongly against full repayment of Credithrift's allowed unsecured claim. Foremost among such factors is "the amount of income of the debtor and the debtor's spouse from all sources" and "the regular and recurring living expenses for the debtor and his dependents." *See, Kull,* 12 B.R. at 659. A review of the official court file reflects that debtors' total monthly income is a meager $617, and is derived exclusively from public assistance programs such as Aid to Dependent Children and the federal food stamp program. With this limited available income, the budget submitted by debtors, who support two minor children, is necessarily austere. Given debtors' dire financial condition, if the Court were to require debtors to repay Credithrift's unsecured claim in full, it would effectively deprive the debtors of a meaningful opportunity to reorganize under Chapter 13. Moreover, any Court-mandated alteration of debtors' already precariously-balanced budget would inevitably lead to feasibility problems. *See,* 11 U.S.C. § 1325(a)(6). In sum, the Court's consideration of the totality of debtors' circumstances leads it to the conclusion that the Chapter 13 plan submitted by debtors in this case has not been submitted in bad faith.

■ Finally, the Court finds that debtors' plan provides an appropriate market rate of interest to rejecting secured credi-

tors. Section 1325(a)(5)(B) requires payment of a market rate of interest to holders of allowed secured claims who reject a Chapter 13 plan. *Memphis Bank,* 692 F.2d at 429. Debtors' plan provides for a ten percent (10%) rate of interest to rejecting secured creditors. Credithrift argues that the ten percent (10%) rate provided is not representative of a current market rate; however, it offered no evidence to support its contention. While a split of authority exists with respect to the proper allocation of the burden of proof in the Chapter 13 confirmation context, *compare, In re Wolff,* 22 B.R. 510, 512 (Bankr. 9th Cir. 1982) with *In re Flick,* 14 B.R. 912 (Bankr. E.D.Pa.1981), the burden of going forward with evidence in support of an objection to confirmation is properly allocated to the objecting party. *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1226 (8th Cir.1987); *In re Fries,* 68 B.R. 676, 685 (Bankr.E.D.Pa.1986); *Matter of Cruz,* 75 B.R. 56, 57 (Bankr.D.P.R.1987). *Cf., In re Mendenhall,* 54 B.R. 44, 45–47 (Bankr.W. D.Ark.1985). Having offered no evidence in support of its argument, Credithrift's bald assertion that debtors' plan fails to provide an appropriate market rate of interest to rejecting secured creditors must be rejected.

Based upon the foregoing, the Objection to Confirmation filed by Credithrift shall be, and the same is hereby, OVERRULED.

IT IS SO ORDERED.