**In re David A. HENRY, Debtor.**

No. 04–60162.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Dec. 28, 2004.

**530**

Stephen E. Schafer, Columbus, OH, for Debtor.

Richard D. Bringardner, Columbus, OH, for AmeriCredit Financial Services, Inc.

Frank M. Pees, Worthington, OH, Chapter 13 Trustee.

### MEMORANDUM OPINION

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

At issue in this case is whether the Chapter 13 plan (the "Plan") filed by David A. Henry ("Henry" or the "Debtor"), which calls for payments over a 39–month period and a return of five cents on the dollar to unsecured creditors, satisfies the confirmation standards set forth in § 1325(a) of the Bankruptcy Code.[1] AmeriCredit Financial Services, Inc. ("AmeriCredit") has objected to confirmation of the Plan, arguing that the Debtor has not proposed the Plan in good faith. AmeriCredit maintains that Henry acted in bad faith by filing this Chapter 13 case a mere 34 days after he obtained a loan from AmeriCredit to purchase a 2004 Pontiac Grand Am SE automobile (the "Grand Am"). What AmeriCredit deems particularly objectionable is the Plan's proposed treatment of its secured claim. Utilizing the "cram-down" option offered by § 1325(a)(5)(B) of the Code,[2] the Debtor

---

[1] 11 U.S.C. §§ 101–1330.

[2] Section 1325(a)(5)(B) authorizes a bankruptcy court to confirm a Chapter 13 plan over the objection of a secured creditor if:

 (i) the plan provides that the holder of such [allowed secured] claim retain the lien securing such claim; and

 (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such [allowed secured] claim is not less than the allowed amount of such claim . . . .

11 U.S.C. § 1325(a)(5)(B). *Household Auto. Fin. Corp. v. Burden (In re Kidd)*, 315 F.3d

671, 675 (6th Cir.2003) ("Although the Bankruptcy Code nowhere uses the words 'cram down,' the term has come to denote the confirmation of a plan over the objection of a secured creditor."); *Wells Fargo Bank Northwest, N.A. v. Yett (In re Yett)*, 306 B.R. 287, 290–91 (9th Cir. BAP 2004) (" 'Cramdown' and 'cram down' are bankruptcy terms of art which do not appear in the Bankruptcy Code: they refer to the modification of the rights of a secured creditor over its objection."). "Under the cramdown option [of § 1325(a)(5)(B) ], the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing

seeks to reduce AmeriCredit's secured claim from the $20,311.93 loan pay-off balance to $13,303, which he claims is the Grand Am's current replacement value. And although the parties' loan agreement stipulates an interest rate of 21.95%, the Plan proposes to pay interest on AmeriCredit's secured claim at the rate of 5% per annum.

Having considered the totality of the circumstances—as instructed by the Sixth Circuit in *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030 (6th Cir.1988)—the Court concludes that confirmation of the Plan must be denied because it was not proposed by the Debtor in good faith. As explained below, among the factors weighing against a finding of good faith are Henry's questionable prepetition conduct, the Plan's limited duration and the modest dividend the Debtor proposes to pay unsecured creditors. Because the Court concludes that confirmation of the Plan should be conditioned on either the Debtor's full payment of his obligation to AmeriCredit in accordance with the parties' contract or his surrender of the Grand Am, it is not necessary to undertake the cram-down analysis required by § 1325(a)(5)(B) of the Bankruptcy Code. Thus, the Court need not determine either the value of the Grand Am or the rate of interest to be paid on AmeriCredit's secured claim.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

## I. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A).

## II. Procedural History

The Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on June 28, 2004 (the "Petition Date"). In accordance with LBR 1015–2, the Debtor filed a Statement of Related or Companion Cases (Doc. 3) along with his petition, disclosing that he previously had filed a Chapter 7 case on October 1, 2001. In his prior Chapter 7 case, Henry received a discharge of unsecured indebtedness totaling $35,015.78, which included the following debts arising from his issuance of checks that were returned for insufficient funds ("NSF"):

| | | |
|---|---|---|
| Advance Auto Parts | $ | 92.00 |
| Advance Auto Parts # 01064 | $ | 67.00 |
| Best Buy | $ | 450.00 |
| Flyers Pizza | $ | 62.00 |
| Giant Eagle | $ | 191.81 |
| Kroger | $ | 196.80 |
| Midas Muffler | $ | 197.00 |
| Stereo Limited | $ | 369.15 |
| Total | | $1,625.76 |

Schedule F—Creditors Holding Unsecured Nonpriority Claims (Case No. 01–61567).

The Plan (Doc. 5) proposes payments to the Chapter 13 Trustee of "$560.00 for 9 months; then $438.00 for 12 months; then $365 monthly until completion" at 39 months (Plan ¶ 1); full payment of allowed secured and priority claims (Plan ¶¶ 2(1) and 2(4)) and a dividend of 5% to holders of allowed unsecured claims (Plan ¶ 2(6)). Under the Plan, AmeriCredit's claim is split into a secured claim of $13,303, which will be paid over 39 months with interest at the rate of 5%, and an unsecured claim

the claim, and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral. The value of the allowed secured claim is governed by § 506(a) of the Code." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) (citations omitted).

of $6,984, which will be paid five cents on the dollar (Plan ¶ 2(4)).

On July 15, 2004, AmeriCredit filed its Objection to Confirmation of Plan and Objection to Valuation of 2004 Pontiac Grand Am (the "Objection "). The Court held an evidentiary hearing on the Objection on September 21, 2004 (the "Hearing").

## III. Factual Background

### A. The AmeriCredit Transaction

Henry purchased the Grand Am from Haydocy Pontiac, a Columbus-area automobile dealer, on May 25, 2004 and executed a "Retail Installment Sale Contract Simple Finance Charge" (the "Note") on that date. AmeriCredit Ex. A. Under the Note, Henry agreed to repay the principal amount of $20,287.36 in 60 monthly installments of $559.73. Henry testified that he purchased the Grand Am to replace his dilapidated 1999 Chevrolet Cavalier (the "Cavalier"), which had body damage, mechanical problems and over 160,000 miles on its odometer. He chose a used car—the Grand Am—because he could not obtain credit approval for a new car, due in part to his previous Chapter 7 bankruptcy filing. At the time he purchased the Grand Am, Henry owed $6,600 on a loan secured by the Cavalier. The Debtor used $6,600 of the loan proceeds received from AmeriCredit to pay off the Cavalier loan. Thus, the note's $20,287.36 principal amount was calculated as follows:

| | | | |
| --- | -------------------------------------------------------------------------------------------- | --- | ---------- |
| (1) | Grand Am cash price (including $6,600 payoff of the Cavalier loan and $1,332.11 in sales tax) | $ | 21,032.11 |
| (2) | Miscellaneous charges | $ | 55.25 |
| (3) | Down payment | $ | (800.00) |
| | | $ | 20,287.36 |

Note at 1. The approximate sticker price of the Grand Am was $13,044.75—i.e., the $21,032.11 cash price less sales tax ($1,332.11), miscellaneous charges ($55.25) and the Cavalier loan payoff ($6,600).

Henry made only one payment of $559.73 on the Note before filing his Chapter 13 petition—34 days after he signed the Note. As of the Petition Date, the Note's payoff balance was $20,311.93.[3] AmeriCredit Ex. C at 1.

### B. The Debtor's Dispute with H.H. Gregg

Despite the fact that only 34 days elapsed between the date that he purchased the Grand Am and the Petition Date, Henry adamantly maintained that he did not execute the Note with the intention of later filing a Chapter 13 case to restructure his obligation to AmeriCredit. Instead, Debtor claimed that he was forced to file this case in order to respond to threats of criminal prosecution arising from his issuance of an NSF check (the "Check") to H.H. Gregg, an appliance retailer that sold the Debtor a refrigerator prior to the Petition Date. These threats allegedly were made by Thomas Johnson, a debt collector who had been retained by H.H. Gregg.

At the Hearing, Henry failed to provide a coherent and consistent explanation of the chronology of events that led to his Chapter 13 filing. As shown below, there are significant discrepancies between Henry's direct and cross-examination testimony. On direct examination, Henry described his dispute with H.H. Gregg and the events preceding the Petition Date in the following manner.

1. Henry closed on the purchase of a new home located at 4307 Knoll Crest

---

**3.** AmeriCredit filed an amended proof of claim (Claim No. 2) in the amount of $20,707.17. However, at the Hearing, Ameri-Credit's counsel presented AmeriCredit Ex. C, which reflects a Petition Date payoff amount of $20,311.93.

Drive, Grove City, Ohio, on March 29, 2004 (the "Closing Date"). To finance the purchase of his home, he obtained a zero-down-payment, "buy-down" loan from Colony Mortgage Corporation (which subsequently assigned the mortgage to Citi-Mortgage, Inc.) in the original principal amount of $162,958. The buy-down mortgage loan provided for a step-up in principal and interest payments in the second and third years of the loan's 30-year amortization period—resulting in a total increase of approximately $200 a month for the remaining life of the loan. To offset this increase in housing cost, the Plan calls for a step-down in monthly payments to the Trustee—from $560 for the first 9 months, to $438 for the next 12 months, to $365 for the remaining 18 months of the Plan.

2. Shortly before the Closing Date, Henry visited H.H. Gregg to shop for appliances. While there, he put a refrigerator, stove and big-screen TV (collectively valued at approximately $3,500) on "layaway." Henry paid for the refrigerator with his debit card. He was persuaded by an H.H. Gregg salesman to write and postdate the Check in order to hold the remaining items—the big-screen TV and stove—on layaway. Henry told the H.H. Gregg salesman that he did not have sufficient funds in his checking account to cover the Check at that time, but H.H. Gregg accepted the Check nonetheless.

3. On March 28, 2004 (the "Delivery Date")—one day before the Closing Date—H.H. Gregg mistakenly delivered the refrigerator, stove and big-screen TV to his new home. Henry surmised that H.H. Gregg simply misread its sales contract and erroneously delivered all of the layaway items, rather than the one item that he had paid for in full—the refrigerator.

4. After the goods were delivered, H.H. Gregg began pressuring Henry to pay for the stove and the big-screen TV. An H.H. Gregg employee telephoned him and offered to lower the total price of all the merchandise if he agreed to pay for the stove and big-screen TV. In response, Henry told the H.H. Gregg store manager that he did not want to keep the stove and big-screen TV and requested that the retailer pick up the goods.

5. Instead of retrieving the goods as he had requested, H.H. Gregg presented the Check to Henry's bank for payment and it was returned NSF.

6. After the Check was dishonored, H.H. Gregg stepped up its pressure for payment, insisting that Henry remit the remaining amount due for the stove and big-screen TV. Henry responded by calling the H.H. Gregg store manager and again asking the retailer to pick up the stove and big-screen TV. H.H. Gregg failed to retrieve the goods as requested.

According to Henry's direct examination testimony, this series of events played out over a two-to-three week period following the Closing Date—i.e., from late March 2004 until mid-to-late April 2004. During this time period, H.H. Gregg presented the Check to his bank several times and, on each occasion, the Check was dishonored. Henry testified that when it became apparent the Check would not clear, Johnson, on H.H. Gregg's behalf, then allegedly began threatening Henry with criminal prosecution on a bad check charge. Henry stated that, at that point in time—which was presumably late April 2004 ( assuming that H.H. Gregg's efforts to obtain payment on the Check did indeed span a three-week period beginning with the Delivery Date, as the Debtor testified on direct examination)—he met with bankruptcy counsel to discuss H.H. Gregg's threats of criminal prosecution. Henry

contacted the same attorney he had previously engaged to file his Chapter 7 case. Henry decided to file a Chapter 13 bankruptcy petition—rather than pursue some other means of legal recourse—to put a halt to Johnson's ongoing threats of criminal prosecution.

On cross-examination, Henry altered the foregoing account of the events leading to the Petition Date in the following respects.

1. In contrast to his direct examination testimony, Henry testified that he did not write the Check for the layaway items until after the Delivery Date. According to Henry's testimony on cross-examination, after H.H. Gregg mistakenly delivered the big-screen TV and stove to his home, he called the store and asked them to retrieve the goods. An H.H. Gregg salesman then suggested that Henry come in to the store to work out a deal that would enable him to keep the merchandise. While at H.H. Gregg, Henry attempted to finance the purchase of the stove and big-screen TV but could not qualify for a loan. When his request for financing was denied, Henry testified that he told the store manager that H.H. Gregg should pick up the stove and big-screen TV. In response to cajoling from the H.H. Gregg salesman, Henry reluctantly decided to write and post-date the Check to pay for the stove and big-screen TV. Henry said that he advised the salesman that there were then insufficient funds in his bank account to cover the Check at that time, and the store agreed to hold the Check for several days.

2. On cross-examination, Henry testified that, after he wrote the Check, he called H.H. Gregg to request that the store retrieve the stove and big-screen TV because he had found comparable, lower-priced merchandise at a different retailer. As he stated on direct examination, H.H. Gregg did not honor his request to pick up the stove and big-screen TV; instead, it presented the Check for payment.

3. On direct examination, Henry testified that he met with his bankruptcy counsel approximately three to four weeks after the Delivery Date (i.e., in late April 2004) when his dispute with H.H. Gregg came to a head and he was threatened with criminal prosecution. On cross-examination, Henry testified that he first met with bankruptcy counsel two to four weeks before the Petition Date (i.e., sometime between May 31, 2004 and June 14, 2004).

Thus, Henry's testimony on direct examination conflicted with his cross-examination testimony on the following points: (1) whether he presented the Check to H.H. Gregg on his first visit to the store (direct examination) or during a subsequent visit after the Delivery Date (cross-examination); (2) whether he gave H.H. Gregg the Check to lay away the stove and big-screen TV (direct examination) or to pay for those items after they already had been delivered to his home (cross-examination); and (3) when he first consulted with counsel to discuss a bankruptcy filing—in late April 2004 (direct examination) or sometime between May 31, 2004 and June 14, 2004 (cross-examination).

■ On July 28, 2004, the Debtor filed a Motion to Impose Sanctions Pursuant to 11 U.S.C. § 362(h) (the "Sanctions Motion"). The Sanctions Motion asserted that Johnson—acting as H.H. Gregg's agent—had violated the automatic stay imposed by 11 U.S.C. § 362(a) by sending a certified letter after the Petition Date that demanded payment of H.H. Gregg's prepetition debt. Johnson's response to the Sanctions Motion alleged that all attempts to pick up the big-screen TV occurred prepetition and thus did not violate the automatic stay. While Johnson admitted sending the Debtor a certified letter after the Petition Date, he claimed that since

the "letter was sent because of a dishonored check written by the [D]ebtor[,]" it was "authorized under [§ 362(b)(11) of] the Bankruptcy Code."[4] Response of Thomas Johnson to Debtor's Motion to Impose Sanctions Pursuant to 11 U.S.C. § 362(a) (Doc. 15) at 2. On September 1, 2004, the Debtor and Johnson submitted an Agreed Order Withdrawing Motion for Sanctions (Doc. 20). The parties agreed that the Sanctions Motion would be "withdrawn and dismissed with prejudice" and that the Debtor would "surrender the 51 [inch] Toshiba flat screen television purchased from [H.H.] Gregg to either [H.H.] Gregg or its representative." *Id.* at 1–2.[5]

## C. The Valuation Testimony

The Plan proposes to cram down AmeriCredit's secured claim from the Note's Petition Date payoff amount of $20,311.93 to $13,303, which the Debtor claims is the Grand Am's replacement value.[6] To support his contention that AmeriCredit's secured claim should not exceed $13,303, the Debtor called Charles Ron Jones to offer expert testimony concerning the Grand Am's replacement value. Jones, a licensed automotive sales dealer, purchases and sells cars at auction as a buyer for the Bobby Layman Chevrolet dealership in Columbus. Based on his personal examination of the Grand Am, his review of various automotive market reports, including sales data derived from the N.A.D.A., the "Black Book" and auction sheets, and his 20 years of experience buying and selling cars at auction, Jones opined that the replacement value of a new 2004 Grand Am SE 4 door Sedan is $15,000. Because the Grand Am has an odometer reading of 25,000 miles, Jones testified that its replacement value should be adjusted downward to $12,000. Although his expert witness pegged the replacement value of the Grand Am at $12,000, Debtor's counsel did not argue for a valuation lower than the

4. Section 362(b)(11) provides that the automatic stay imposed by § 362(a) of the Code does not stay "the presentment of a negotiable instrument and the giving of and protesting dishonor of such an instrument." 11 U.S.C. § 362(b)(11). The purpose of this exception is to enable the holder of the instrument to enforce it against secondary obligors, such as indorsers of the instrument. *See In re Jastrem*, 224 B.R. 125, 127–28 (Bankr. E.D.Cal.1998), *aff'd*, 253 F.3d 438 (9th Cir. 2001). Section 362(b)(11) clearly does not grant a creditor license to dun a debtor following a bankruptcy filing to collect a debt arising from a bad check. "The purpose of this exception to the automatic stay is not to give the holder of an instrument made by the debtor, such as a check, the right to enforce it against the debtor or the debtor's bank account after debtor has filed a bankruptcy petition." *Id.* at 127 (citing *Wittman v. State Farm Life Ins. Co. (In re Mills)*, 176 B.R. 924, 928 (D.Kan.1994)).

5. Whether the Debtor ultimately retained or returned the stove is unclear. Henry made no mention of the stove's ultimate disposition in his Hearing testimony and the agreed order resolving the Sanctions Motion also was silent on this point.

6. In *Rash*, the Supreme Court held that in the context of a § 1325(a)(5)(B) cram down of a claim secured by the debtor's automobile, bankruptcy courts should utilize a "replacement value" standard to determine the amount of the creditor's allowed secured claim. The Supreme Court explained that "replacement value" does not mean the amount a Chapter 13 debtor would be required to spend to purchase a new automobile but, rather, "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property *of like age and condition.*" *Id.* at 959 n. 2, 117 S.Ct. 1879 (emphasis added). In *First Merit N.A. v. Getz (In re Getz)*, 242 B.R. 916, 917 (6th Cir. BAP 2000), the Sixth Circuit Bankruptcy Appellate Panel held that the bankruptcy court's use of the average between the National Automobile Dealers Association ("N.A.D.A.") wholesale and retail values as the starting point in determining a vehicle's replacement value is consistent with *Rash.*

$13,303 amount set forth in Henry's bank-ruptcy schedules, which approximates the mid-point between the Kelley Blue Book retail and the trade-in (wholesale) values for a 2004 Pontiac Grand Am SE 4–door sedan with 20,000 miles on its odometer. Debtor's Ex. 1.

AmeriCredit did not offer expert testimony to establish a replacement value for the Grand Am. On cross-examination, AmeriCredit's counsel presented Henry with a N.A.D.A. vehicle valuation report for a 2004 Pontiac Grand Am SE sedan with an odometer reading of 19,500 miles. N.A.D.A. Official Used Car Guide Vehicle Valuation (the "Grand Am Valuation Report"), AmeriCredit Ex. E. The Grand Am Valuation Report listed the vehicle's retail value at $21,154.37. *Id.* The Grand Am Valuation Report did not set forth a wholesale or trade-in value for that make and model car due to its recent manufacture date. Henry testified that the Grand Am Valuation Report was not accurate because the vehicle invoice attached to the document described an automobile that differed in significant respects from the Grand Am. Specifically, the invoice attached to the Grand Am Valuation Report listed several items—a sunroof, chrome wheels and an eight-speaker sound system—that were not included as options on the Grand Am.

Jones also was asked to offer his opinion of the value of the Cavalier that Henry traded in to acquire the Grand Am. Jones testified that the Cavalier would have a replacement value of $500 to $600. AmeriCredit, in turn, presented a N.A.D.A. report for a 1999 Cavalier reflecting a retail value of $3,225. N.A.D.A. Vehicle Report (the "Cavalier Valuation Report"), AmeriCredit Ex. D. Jones testified that a $3,225 value for the Cavalier was far too high, pointing out that the Cavalier Valuation Report assumed a mileage of 100,000 miles, while Henry's Cavalier had an odometer reading of 160,000 miles, mechanical problems and body damage.[7]

### D. The Ziebart Transaction

On cross-examination, Henry acknowledged that he had the Grand Am's windows tinted at Zeibart of Ohio ("Zeibart") approximately one month after he purchased the vehicle and just a few days before the Petition Date. Henry also admitted that he presented Zeibart with a personal check for this work that ultimately was returned NSF. Debtor's "Schedule F—Creditors Holding Unsecured Nonpriority Claims" lists Zeibart as a the holder of an unsecured claim in the amount of $160 and states: "Consideration: returned check."

### IV. Arguments of the Parties

 The parties have markedly different views of how the Court should approach the issue of the Plan's confirmabili-

---

7. Even though Debtor submitted a similar Kelley Blue Book valuation report (Debtor Ex. 1), he objected to the admissibility of the Grand Am and Cavalier Valuation Reports (AmeriCredit Exs. D and E, respectively). While these types of reports clearly constitute hearsay, they are nevertheless admissible because they fit within the market-report exception. *See In re Williams,* 224 B.R. 873, 874 n. 2 (Bankr.S.D.Ohio 1998) ("Federal Rule of Evidence 801(17), provides that market reports or compilations generally relied upon by the public or by persons in particular occupations are not excluded by the hearsay rule.

The NADA Blue Book has been found to fit within this exception to the hearsay rule.") (citing *In re Roberts,* 210 B.R. 325, 330 (Bankr.N.D.Iowa 1997)). The Court admitted the Grand Am and Cavalier Valuation Reports. But had the Court been required to make a determination of the value of either the Grand Am and/or the Cavalier, it would have given these documents little or no weight given the significant variations in equipment options and mileage between the Debtor's vehicles and those listed in the Grand Am and Cavalier Valuation Reports.

ty. Henry seeks to obtain confirmation of the Plan over AmeriCredit's objection, invoking the cram-down power provided by § 1325(a)(5)(B) of the Code. Thus, the Debtor argues that confirmation of the Plan should turn on a straightforward application of § 1325(a)(5)(B), which requires the Court to follow a two-step process:[8] first, determine the amount of AmeriCredit's secured claim by valuing the Grand Am pursuant to § 506(a)[9] and, second, fix the appropriate interest rate payable on the secured claim in accordance with the "formula approach" recently approved by a plurality of the Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).[10] Application of § 1325(a)(5)(B)'s cram-down formula, the Debtor argues, will establish that AmeriCredit's secured claim has been properly fixed at $13,303 and that 5% is an appropriate discount rate.

By AmeriCredit's reckoning, the Court need not undertake a cram-down analysis under § 1325(a)(5)(B) because the Plan fails to meet § 1325(a)(3)'s threshold requirement of good faith. AmeriCredit submits that the Sixth Circuit's *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982) decision is on all fours with this case and should control here. According to AmeriCredit, Henry engaged in "questionable conduct" by purchasing the Grand Am only 34 days before the Petition Date. Under these circumstances, *Memphis Bank* requires that the Debtor be held to the terms of the contract, AmeriCredit argues. Thus, AmeriCredit maintains that confirmation of the Plan should be conditioned on Henry's payment of AmeriCredit's entire $20,311.93 debt as a secured claim, with interest at the 21.95% rate stipulated in the parties' contract.

## V. Legal Analysis

■ To be confirmed, a Chapter 13 plan must be proposed in good faith. 11 U.S.C. § 1325(a)(3); *Ed Schory & Sons. Inc. v. Francis (In re Francis)*, 273 B.R. 87, 91 (6th Cir. BAP 2002) ("[A] debtor's plan cannot be confirmed unless it is proposed in good faith . . . .") (citing *Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir.1990) *("Caldwell II")*), *aff'd*, 69

---

8. "There are two separate valuations involved in the cram down of a secured claim. First, the court must determine the value of the creditor's collateral. Second, the court must determine the value of the deferred payments proposed by the plan to determine whether the present value of such payments at least equals the value of the collateral." *Yett*, 306 B.R. at 291 (quoting David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 438 (1998) (footnotes omitted)).

9. Section 506(a) of the Code provides that when the value of the property that secures a claim is less than the amount of the claim, the claim is an allowed secured claim to the extent of the value and is an allowed unsecured claim for the balance. 11 U.S.C. § 506(a). "Cramdown starts with § 506(a) which basically provides that a creditor holding a security interest in property has a secured claim only to the extent there is value in that prop-

erty to provide actual security for its claim." *In re Mattson*, 210 B.R. 157, 159 (Bankr. D.Minn.1997). As previously noted, the Supreme Court's *Rash* decision holds that in a cram down under § 1325(a)(5)(B), a bankruptcy court making a § 506(a) valuation should use a replacement value standard to determine the allowed amount of a claim secured by a debtor's automobile.

10. In *Till*, the Supreme Court addressed the methodology for determining the appropriate interest rate to be paid to secured creditors in the context of a § 1325(a)(5)(B) cram down. The Court adopted the so-called formula approach to establishing cram-down interest rates under § 1325(a)(5)(B). *Till*, 541 U.S. 465, 124 S.Ct. at 1961. Under the formula approach, a bankruptcy court must begin with a "riskless" prime rate and then make an upward adjustment to that rate to account for the risk of default and nonpayment by the debtor. *Id.*, 124 S.Ct. at 1961–62.

Fed.Appx. 766, 2003 WL 21782600, at *1 (6th Cir.2003); *In re Carver,* 110 B.R. 305, 307 (Bankr.S.D.Ohio 1990) ("It is axiomatic that good faith is essential to the confirmation of every Chapter 13 plan."). "[W]hile the objecting party must meet the initial burden of producing evidence in support of his objection, the debtor bears the ultimate burden of persuasion on the issue of compliance with the confirmation criteria contained in § 1325(a)." *Carver,* 110 B.R. at 311. *See also Francis,* 273 B.R. at 91 ("[T]he debtor bears the burden of proving his good faith.").

The Sixth Circuit first addressed § 1325(a)(3)'s good faith standard in *Memphis Bank.* The debtor in *Memphis Bank* "puffed" her income on an automobile loan application two months before filing a Chapter 13 petition. The Sixth Circuit reversed and remanded the bankruptcy court's order confirming the debtor's plan, which called for a reduction in the interest rate on the automobile loan from the contract rate of 21% to a rate of 10%. The *Memphis Bank* court reasoned:

> [A] debtor [must not be allowed] to obtain money, services or products from a seller by larceny, fraud or other forms of dishonesty and then keep his gain by filing a Chapter 13 petition within a few days of the wrong. To allow the debtor to profit from his own wrong in this way through the Chapter 13 process runs the risk of turning otherwise honest consumers and shopkeepers into knaves....

> One way to refuse to sanction the use of the bankruptcy court to carry out a basically dishonest scheme under Chapter 13 is to deny confirmation to the proposed plan. When the debtor's conduct is dishonest, the plan simply should not be confirmed. Unless courts enforce this requirement, the debtor will be able to thwart the statutory policy denying

discharge in Chapter 7 cases for dishonesty.

> Another way to deal with the problem when the conduct is questionable but is not shown to be dishonest, as the Bankruptcy Court found it to be in the instant case, is to require full payment in accordance with the contract.

*Memphis Bank,* 692 F.2d at 432.

■ "To avoid a rigid interpretation of the *Memphis Bank* decision which would automatically require 100% repayment of a debt any time 'questionable' (not purely dishonest) pre-plan conduct is found, the Sixth Circuit subsequently clarified its [*Memphis Bank* holding] in *In re Okoreeh–Baah,* 836 F.2d 1030, 1033 (6th Cir. 1988)." *In re Sharon,* 200 B.R. 181, 196 (Bankr.S.D.Ohio 1996), *aff'd,* 234 B.R. 676 (6th Cir. BAP 1999). "The *Okoreeh–Baah* court stated that the circuit 'did not mean to adopt a rule requiring 100% payment *any* time questionable pre-plan conduct exists, without analyzing any of the debtor's other circumstances.'" *Id.* (quoting *Okoreeh–Baah,* 836 F.2d at 1032 (internal quotation omitted) (emphasis in original)). "Concluding that *Memphis Bank* did not establish a per se rule, but was merely offering a possible avenue of recourse for courts dealing with debtors who have engaged in 'questionable pre-plan conduct,' the *Okoreeh–Baah* court adopted a 'totality of the circumstances' standard which employs a fact-specific analysis and requires the use of discretion by the bankruptcy judge." *Id.* "Critical to the 'good faith' determination is whether there is 'a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources.'" *Id.* (quoting *Okoreeh–Baah,* 836 F.2d at 1033).

"The Sixth Circuit has indicated that 'a debtor's pre-petition conduct is but one element' and that bankruptcy courts must look to the totality of the circumstances in

determining a debtor's good faith in filing a chapter 13 petition and plan." *Francis,* 273 B.R. at 91 (quoting *Okoreeh–Baah,* 836 F.2d at 1033). While "[g]ood faith is an amorphous notion, largely defined by factual inquiry," *Okoreeh–Baah,* 836 F.2d at 1033, "[t]he Sixth Circuit 'has suggested a twelve-part test to determine whether a debtor's Chapter 13 plan is proposed in good faith.'" *Francis,* 273 B.R. at 91 (quoting *Caldwell II,* 895 F.2d at 1126). These criteria are:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increase in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and,

(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code. *Id.* (citing *Caldwell II,* 895 F.2d at 1126–1127). Additional considerations also can supplement the above factors, which include:

[(1)] [that] good faith does not necessarily require substantial repayment of the unsecured claims;

[(2)] [that] the fact a debt is nondischargeable under Chapter 7 does not make it nondischargeable under Chapter 13; and

[(3)] the fact that a debtor seeks to discharge an otherwise nondischargeable debt is not, per se, evidence of bad faith but may be considered as part of the totality of the circumstances analysis.

*Id.* (quoting *Hardin v. Caldwell (In re Caldwell),* 851 F.2d 852, 859–60 (6th Cir. 1988) ("*Caldwell I*") ).[11] The foregoing factors "do not constitute an exhaustive list, but merely serve as guidelines for a 'good faith' determination." *Sharon,* 200 B.R. at 196. For example, "close proximity in time between a debtor's purchase of collateral and the filing of a chapter 13 petition may evidence lack of good faith." *Id.*

■ As *Okoreeh–Baah* and its progeny make clear, a per se rule requiring full repayment of obligations arising from a debtor's questionable pre-petition conduct has not been adopted in the Sixth Circuit. *Caldwell I,* 851 F.2d at 858 ("The panel in *Okoreeh–Baah* specifically rejected the contention that when a debtor's pre-plan

---

**11.** *See also In re Randall,* 310 B.R. 830, 832 (Bankr.S.D.Ohio 2004) (applying the factors enumerated in *Okoreeh–Baah, Caldwell I and Caldwell II* to assess whether plan had been proposed in good faith); *In re Stein,* 310 B.R. 826, 828–829 (Bankr.S.D.Ohio 2004) (same); *In re Jones,* 301 B.R. 840, 843–44 (Bankr. E.D.Mich.2003) (same).

conduct has been 'questionable,' 100% re-payment on that debt is required."); *In re Keffer*, 87 B.R. 509, 511 (Bankr.S.D.Ohio 1988) ("[*Memphis Bank* did not establish] an immutable rule requiring full payment of claims incurred through a debtor's questionable conduct . . . ."). Rather, the upshot of these decisions is that a bankruptcy court's good faith analysis must take into account the totality of the circumstances in a given case, including the factors enumerated by the Sixth Circuit in *Okoreeh-Baah, Caldwell I* and *Caldwell II. Okoreeh-Baah*, 836 F.2d at 1033 ("[A] good faith determination under § 1325(a)(3) requires an inquiry into all the facts and circumstances of a debtor's proposed plan.").

■■ While the 100% repayment requirement imposed in *Memphis Bank* is but "one possible avenue of recourse for courts dealing with debtors who have engaged in 'questionable pre-plan conduct,'" *Sharon*, 200 B.R. at 196 (quoting *Okoreeh-Baah*, 836 F.2d at 1032), that remedy is particularly appropriate here given Henry's questionable prepetition conduct. As Judge Lundin, a leading commentator on Chapter 13 practice, observed in his treatise:

> Many courts have questioned good faith when the debtor acquired assets or borrowed money just before filing and the plan seems to compound the indiscretion. The gist of these cases is that debtors sincerely in need of Chapter 13 relief should not be buying new cars or new homes or borrowing large sums of money on the eve of filing. Especially telling is evidence that the debtor consulted with bankruptcy counsel and then bought a car or borrowed money. If the debtor has recently acquired any significant asset, counsel should advise the debtor to surrender the new acquisition as part of the plan.

Keith M. Lundin, *Chapter 13 Bankruptcy* § 181.1 at 181–4 to 181.6 (3d ed. 2000 & Supp.2004). *See also In re Mathenia*, 220 B.R. 427, 433 (Bankr.W.D.Okla.1998) ("It is simply not right for debtors to voluntarily obligate themselves for the purchase of property which they clearly can not afford, . . . in anticipation of bankruptcy, and then expect to retain the property and force their . . . creditors to pay for their folly, or their guile, as the case may be, by having their claims discharged, in whole or material part, in a subsequent bankruptcy."); *In re Barnes*, 191 B.R. 963, 965–66 (Bankr. M.D.Ga.1996) ("In this case, it is unfair to allow Debtor to value the vehicle which is the subject of the installment sale contract within one hundred five days following delivery of that vehicle. If Debtor proposes to retain the vehicle, she should propose to pay the [secured creditor's] claim in full.") (footnote omitted).

The close proximity in time between Henry's purchase of the Grand Am and the Petition Date convince the Court that he sought bankruptcy relief in order to gain an unfair advantage over AmeriCredit and thus has not proceeded in good faith. It is unclear whether Henry consulted with bankruptcy counsel before or after he purchased the Grand Am; his testimony on this point was muddled and conflicting. On direct examination, he testified that he met with bankruptcy counsel in late April 2004—about a month before he bought the Grand Am. If this is indeed true, then, in the Court's view, Henry's conduct would cross the line from questionable conduct to outright dishonesty. On cross-examination, Henry had a different recollection of the timing of his initial meeting with bankruptcy counsel, testifying that he first met with his attorney two to four weeks before the Petition Date (between May 31, 2004 and June 14, 2004). Assuming this version of events is correct, then Henry met with

his bankruptcy counsel only 6 to 20 days after he signed the Note. And a mere 34 days after financing the Grand Am, the Debtor filed his petition and proposed a cram-down plan that calls for more than a $7,000 reduction in AmeriCredit's secured claim (from the Note's $20,311.93 payoff amount to $13,303). As stated above, AmeriCredit agreed to loan Henry $6,600 more than the purchase price of the Grand Am so that he could pay off the loan secured by the Cavalier, a vehicle that the Debtor's expert witness valued at $500–$600. Thus, if the Plan is confirmed, the Debtor will reap a windfall at AmeriCredit's expense.

Faced with a similar fact pattern, the bankruptcy court in *Barnes* denied confirmation of a Chapter 13 plan that sought to cram down a claim secured by an automobile purchased 105 days before the debtor's bankruptcy filing, reasoning:

> [I]f the Debtor's plan is confirmed, it will create a virtual windfall for the Debtor in allowing her to reduce her obligations under the contract with [the secured creditor] within a short time after taking possession of the vehicle while at the same retaining all the benefits of that contract in the form of the vehicle for herself. Such a benefit and its corresponding detriment occurring so soon after the transaction was undertaken is simply unfair and unsuitable to the equitable environment in which cases in this court must exist.

*Barnes*, 191 B.R. at 965. Just so here. Under these circumstances, to allow the Debtor to gain an economic advantage at AmeriCredit's expense would violate the spirit of the Bankruptcy Code. *See In re Pike*, 258 B.R. 876, 880–81 (Bankr. S.D.Ohio 2001) ("The Code's central purpose is remedial: to afford the honest but unfortunate debtor 'a new opportunity in life with a clear field for future effort,

unhampered by the pressure and discouragement of preexisting debt.' But debtors who do not file in good faith and seek to abuse the bankruptcy process should not be afforded relief.") (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)); *In re Zaleski*, 216 B.R. 425, 429 (Bankr.D.N.D.1997) ("The [good faith] requirement has at its heart the fundamental notion that bankruptcy is intended to afford the honest but unfortunate debtor the opportunity to gain … a fresh start …. ").

The Debtor maintains that he did not purchase and finance the Grand Am with an eye toward a subsequent bankruptcy filing. Rather, Henry argues that he was forced to file this case due to an unanticipated change in circumstances—namely, the threats of criminal prosecution made by Johnson on H.H. Gregg's behalf after the Check was returned NSF. True, evidence of a lack of good faith arising from "[t]he purchase of a new vehicle followed by an immediate filing" may be "mitigated by an intervening event such as the loss of a job or other abrupt change of economic circumstance." *In re Reynolds*, 17 B.R. 489, 493 (Bankr.N.D.Ga.1981). *See also Sharon*, 200 B.R. at 196 ("[C]lose proximity in time between a debtor's purchase of collateral and the filing of a chapter 13 petition may evidence lack of good faith; however, … an unanticipated change in circumstances can mitigate an apparent lack of good faith."); *Barnes*, 191 B.R. at 964–65 (same). But Debtor's claim that he is a victim of an unanticipated, intervening circumstance rings hollow. Henry testified that his dispute with H.H. Gregg came to a head about three weeks after the Closing Date—i.e., by late April 2004. Henry purchased the Grand Am on May 25, 2004. So, at the time he signed the Note, Henry was embroiled in his dispute with H.H. Gregg *and must have known* that he would have to deal with the retail-

er's threats of prosecution in one way or another. Thus, unlike the debtors in *Sharon* (divorce and unanticipated repossession of debtor's only vehicle), *Barnes* (unanticipated termination of unemployment benefits) and *Reynolds* (debtor's employment situation changed for the worse), Henry cannot credibly contend that he was the victim of an unanticipated change of circumstances.

While Henry stated that the sole reason he filed this Chapter 13 case was to deal with his legal dispute with H.H. Gregg, this testimony strains credulity. There assuredly were equally efficient and cost-effective ways of resolving that dispute short of a bankruptcy filing. If Henry's version of the events surrounding his presentation of the Check to H.H. Gregg is true, then he could have defended the threatened criminal charges if they in fact materialized. Civil proceedings against H.H. Gregg (or their threat) also offered an avenue for relief. Hence, the Debtor's suggestion that he was forced into bankruptcy is simply untrue. Moreover, Henry's contention that his filing was motivated solely by the need to deal with H.H. Gregg's threats of criminal prosecution is belied by the course of events in this case. Henry's dispute with H.H. Gregg was settled on September 1, 2004 with the entry of the agreed order that provided for the withdrawal of the Sanctions Motion and turnover of the big-screen TV. Having resolved the dispute that purportedly was the sole precipitating cause of his filing, Henry could have simply dismissed his Chapter 13 case at that point in time.[12] Yet the Debtor elected to forge ahead with his Plan and the proposed cram down of Americredit's secured claim. In short, having observed Henry's demeanor as a witness and assessed his credibility, the Court is not persuaded that the Debtor's desire to clear up the controversy with H.H. Gregg was the sole motivation for his bankruptcy filing. Rather, the Court is convinced that Henry also sought relief in order to gain an unfair economic advantage over AmeriCredit by restructuring (i.e., cramming down) a secured obligation incurred shortly before the Petition Date.

The Debtor's lack of good faith is also demonstrated by his eve-of-bankruptcy transaction with Ziebart. After meeting with bankruptcy counsel, and just days before the Petition Date, Henry had the Grand Am's windows tinted at Ziebart and paid for this service with a check that was returned NSF. Although he clearly had to have known that his Chapter 13 petition would be filed within a matter of days, Henry proceeded to obtain this service from Ziebart and left it holding the bag. As the Sixth Circuit observed in *Memphis Bank*, "allow[ing] the debtor to profit from his own wrong in this way through the Chapter 13 process runs the risk of turning otherwise honest consumers and shopkeepers into knaves." *Memphis Bank*, 692 F.2d at 432.

The Debtor's questionable prepetition conduct is but one element in the Court's good faith calculus, which must include an analysis of the totality of the circumstances. *Francis*, 273 B.R. at 91–92 (citing *Okoreeh–Baah, Caldwell I and Caldwell II*). As previously noted (*see supra* at pp. 538–39), in *Caldwell II* the Sixth Circuit set forth a list of twelve factors that bankruptcy courts should consider in determining whether a Chapter 13 plan has been proposed in good faith (the "Good Faith Factor(s)"). *See Caldwell II*, 895 F.2d at 1126–27. Applying this twelve-

---

12. Section 1307(b) of the Bankruptcy Code provides a debtor with the absolute right to dismiss his or her Chapter 13 case so long as the case "has not [previously] been converted under section 706, 1112, or 1208 [of the Code]." 11 U.S.C. § 1307(b).

factor test, the Court concludes, for the reasons detailed above, that Henry had an improper motivation and lacked sincerity in seeking Chapter 13 relief (Good Faith Factor 10) and has attempted to abuse the spirit of the Bankruptcy Code (Good Faith Factor 12). *See Caldwell II,* 895 F.2d at 1126–27; *Francis,* 273 B.R. at 91.

In addition to the Good Faith Factors implicated by the Debtor's questionable pre-filing conduct, several other factors also point to a finding of bad faith. The Debtor's monthly Plan payment of $560 could be raised significantly if he reduced his monthly housing cost ($1,063)[13] and his food budget ($430), both of which seem excessive for a single person with no dependents living in Grove City, Ohio (Good Faith Factor 1). *See Caldwell II,* 895 F.2d at 1126; *Francis,* 273 B.R. at 91. *See also In re Leone,* 292 B.R. 243, 245 (Bankr.W.D.Pa.2003) ("A good faith effort would require that Debtors find replacement housing for themselves and their two adult children at a cost of less than $2,347 per month ...."); *In re Rice,* 72 B.R. 311, 312 (D.Del.1987) ("[T]he Debtors do have th[e] ability [to make higher plan payments], although it will require adjustments on their part which are greater than keeping their new house at the expense of their unsecured creditors."). Further, had Henry extended the duration of his Plan (Good Faith Factor 3) from 39 months to the 60–month allowable maximum (*see* 11 U.S.C. § 1322(d)), he could have modified AmeriCredit's secured claim to a much lesser extent (Good Faith Factor 6) and/or substantially increased the 5% dividend to general unsecured creditors. *See Caldwell II,* 895 F.2d at 1126; *Francis,* 273 B.R. at 91. *See also In re Lancaster,* 280 B.R. 468, 481 (Bankr.

W.D.Mo.2002) ("While the Debtor cannot be required to file a plan extending beyond 36 months, the Court considers the proposed 36–month [3% dividend] plan, when combined with the rather small monthly payments he has proposed to not be proposed in good faith."); *Francis,* 273 B.R. at 90 (noting that the fact that debtor's plan runs for the maximum 60–month time period allowable by the Code is a factor supporting the bankruptcy court's good faith finding); *Zaleski,* 216 B.R. at 431 ("Although ... the duration of the plan is not by itself indicative of bad faith, it is a factor in gauging the debtor's sincerity where, as here, a three-year plan operates to reduce the return to pre-petition creditors."). Given the Plan's limited duration and the minimal return offered to unsecured creditors, the Court is not convinced that it constitutes "a sincerely-intended payment of pre-petition debt consistent with the [D]ebtor's available resources." *Okoreeh–Baah,* 836 F.2d at 1033. *See also Mason v. Young (In re Young),* 237 F.3d 1168, 1178 (10th Cir. 2001) ("The policy of allowing a fresh start does not license debtors to lightly rid themselves of the burden of their indebtedness without an honest attempt at repayment.").

Good Faith Factor 9 requires the Court to consider "the frequency with which the debtor has sought [bankruptcy] relief." *See Caldwell II,* 895 F.2d at 1126; *Francis,* 273 B.R. at 91. Henry obtained a Chapter 7 discharge less than three years before filing this case. That factor, standing alone, is not indicative of bad faith. Yet it is troubling that, despite no discernible change in his financial circumstances, Henry is again seeking bankruptcy relief

---

**13.** The Debtor's $1,063 monthly housing expenditure includes a $35 per-month charge for a home security system. And as noted above, under the terms of his buy-down mortgage loan, Henry's monthly housing expenditure will increase by nearly $200 in the third year of the loan's 30–year amortization period.

following what appears to have been an eve-of-filing spending spree—which included the purchase of a new home[14] and a big-screen TV only three months before the Petition Date and a late-model car just 34 days before the Petition Date. Moreover, as his dealings with Ziebart illustrate, Henry has continued his penchant for writing bad checks that came to light in his previous Chapter 7 filing. Thus, while a repeat filing does not necessarily demonstrate bad faith, the Debtor's unbroken pattern of financial irresponsibility raises serious questions as to his bona fides.

The remaining Good Faith Criteria are essentially neutral: Henry's employment appears to be stable, but unlikely to result in substantial future increases in income (Good Faith Factor 2); no allegations have been made concerning inaccuracies in Debtor's schedules, statements, and projections of income and expenses (Good Faith Factor 4); the Plan does not propose either preferential treatment between classes of creditors (Good Faith Factor 5) or call for the discharge of debts that would be nondischargeable in a Chapter 7 case (Good Faith Factor 7); there exist no special circumstances, such as inordinate medical expenses (Good Faith Factor 8) and the Plan's administration would not place an undue burden on the Chapter 13 Trustee (Good Faith Factor 11). *See Caldwell II,* 895 F.2d at 1126–27; *Francis,* 273 B.R. at 92.

In sum, having considered the totality of the circumstances, the Court concludes that the Debtor has not proposed the Plan in good faith. While *Memphis Bank* did not establish a per se rule requiring 100% repayment of every obligation incurred through questionable conduct, for the reasons explained above, the Court concludes that the 100% repayment remedy should be imposed here.

## VI. Conclusion

For these reasons, the Court will enter a separate order denying confirmation of the Plan and conditioning confirmation of any amended plan upon either: (1) full repayment of AmeriCredit's secured claim in accordance with the terms of the Note; or (2) the Debtor's surrender of the Grand Am to AmeriCredit.

**IT IS SO ORDERED.**

---

**14.** Henry purchased his new home for $162,958, an amount that exceeds his annual income by more than four times.