In re Timothy J. McDONALD, Jennifer D. McDonald, Debtors.

No. 10–31313.

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

Sept. 30, 2010.

Lester R. Thompson, Dayton, OH, for Debtors.

**Decision Denying Confirmation of the Debtors' Chapter 13 Plan**

GUY R. HUMPHREY, Bankruptcy Judge.

## I. Introduction

The issue before the court is whether the debtors' Chapter 13 plan should be confirmed. For the reasons set forth below, the court finds that it should not be confirmed.

The following constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. The findings of fact are derived from Mr. and Mrs. McDonald's (the "Debtors") testimony and the record in this matter. In making its determination, the court also considered the arguments of counsel at the confirmation hearing held on June 3, 2010 (the "Hearing"), the Debtors' Schedules (A–J) and Statement of Financial Affairs (Doc. 1), the Debtors' amended Chapter 13 Plan (Docs. 6 and 16) (the "Plan"), the *Chapter 13 Trustee's Objection to Confirmation of Plan and Request for Denial of Confirmation* (Doc. 23) (the "Trustee" and the "Trustee Objection"), the *Kettering Health Network Objection to Confirmation of Plan* ("KHN" and the "KHN Objection"), the Ohio Department of Taxation *Objection to Confirmation of Plan* (Doc. 29) ("ODT" and the "ODT Objection"), and the post hearing memoranda submitted by the Debtors (Doc. 48) (the "Debtors' Brief"), the Trustee (Doc. 46) (the "Trustee's Brief"), and ODT (Doc. 49) (the "ODT Brief").

## II. Procedural Background, Findings of Fact, and Positions of the Parties

### A. Procedural Background and Findings of Fact

Mr. McDonald is self-employed, owning a business called "Security Group of North

America, Inc." which provides security to businesses. Ms. McDonald is a physician employed by the Kettering Medical Center. According to their Schedule I, the Debtors' combined average monthly income, after deducting payroll taxes, child support, and other charges, is $12,939. The Debtors' Schedule J monthly expenses total $7,939, leaving a monthly net income of $5,000. According to the Trustee's Objection, the Debtors' "means test disposable monthly income" is a negative $1,239.14, as shown on line 59 of the *Debtors' Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income* (Official Form B22C, Doc. 1). The Debtors list four dependent sons on their Schedule I, ranging in age from 3 to 10 years old.

Mr. McDonald owns a four bedroom house purchased for $376,000 and appraised at $365,000 located at 450 Springhouse Drive, Springboro, Ohio which serves as the family residence for Mr. and Ms. McDonald and their four sons. The house is encumbered by two mortgages, a first mortgage held by National City Bank (now known as PNC Bank) and a second mortgage held by Fifth Third Bank. The combined outstanding principal amount of both mortgages is approximately $358,330. Monthly payments on the first mortgage are $2,325 and on the second mortgage $429.49.[1] The combined monthly mortgage payments total $2,754.49.

Ms. McDonald owns a vacant lot purchased for $200,000, valued at $162,500 with a mortgage balance of $192,993, which the Debtors propose to surrender to the mortgagee.

Ms. McDonald also owns a 2007 GMC Denali (the "Denali"), purchased in September 2009 with a monthly payment of $834.90. Ms. McDonald acquired the Denali in October 2009 to replace a GMC Avalanche and a 2005 mini van that Ms. McDonald had purchased new, that had between 60,000 and 70,000 miles at the time of sale and was "worn." The monthly payments on the Denali are less than what the combined payments were on the two traded vehicles. Ms. McDonald also owns a 2003 BMW 3.30 CI purchased in October 2007 with a monthly payment of $347.65. KHN and the Debtors agree that the value of the BMW exceeds the $13,459.42 owed on it at the time of the Hearing. The total of the monthly payments on the Debtors' two vehicles is $1182.55. The total of the monthly payments on the house and the two vehicles is $3,937.04. Ms. McDonald also owns a 2005 Harley Davidson motorcycle valued at $7,500, which is free and clear of liens.[2]

The Debtors filed this Chapter 13 bankruptcy case on March 10, 2010 (Doc. 1). Also on March 10, 2010, the Debtors filed an initial plan (Doc. 6), which they amended on April 14, 2010 (Doc. 16).[3] As noted,

---

1. The Debtors and Fifth Third Bank entered into a loan modification agreement approved by the court which reduces the interest rate and the monthly payments on the Fifth Third mortgage from $525 (as stated in the Plan) to $429.49 from June 25, 2010 through May 25, 2015 (as indicated in Fifth Third's amended proof of claim) (*See also* Doc. 41). Fifth Third's original proof of claim listed a mortgage payment of $578.39, but even using the Debtors' figure, the refinancing results in a savings of $95.51 each month for the Debtors.

2. The testimony established that Mr. McDonald, not Ms. McDonald, drives the Harley Davidson motorcycle.

3. The Debtors amended their initial plan following the meeting of creditors to include non-exempt tax refunds to first be used to satisfy the Internal Revenue Service's secured and priority claim and then as additional payments to unsecured creditors (Doc. 16).

the Trustee, KHN, and ODT filed objections to the Plan.

Mr. McDonald owes a substantial amount of state and federal taxes related to the operation of his former and current companies. The State of Ohio has filed two proofs of claim (Claims 15–1 and 20–1) totaling almost $300,000. Mr. McDonald disputes that amount. According to Schedule E, Mr. McDonald's liability to the State of Ohio is approximately $130,000. However, at the Hearing, Mr. McDonald testified that he estimates his tax liability to the State of Ohio to be about $185,000. Mr. McDonald explained that the debt owed to the State of Ohio arises from his wholly owned businesses' failure to pay sales taxes from early 2003 to the end of 2009.[4] According to the Debtors' Schedule B, Mr. McDonald's business resumed paying sales taxes as of January 1, 2010. However, at the Hearing, Mr. McDonald testified that the business resumed paying sales taxes after the filing of the petition. The Internal Revenue Service has also filed a proof of claim in an amount of $60,467.70, including a priority claim in the amount of $32,840.62 (Claim 3–1).

The Debtors' scheduled unsecured debt exceeds $235,000 and is mostly comprised of credit card debt and Ms. McDonald's educational loan debt with the remaining being unsecured tax debt and some business debt.

The Plan proposes to pay $5,000 each month over a 60 month commitment period. However, in the Debtors' Brief, the Debtors propose that their Plan be confirmed "at $5,096.00 per month." Approximately 21% of the Debtors' gross income ($3,940.14/$18,951.20) is dedicated to making the Debtors' house and car payments. Approximately 27% of the Debtors' gross income is to be paid to the Trustee pursuant to the Plan ($5,096/$18,951.20). In addition, the Debtors propose to turnover the non-exempt portion of their federal income tax refunds over the commitment period. The Plan provides a 0% dividend to nonpriority unsecured creditors; however, depending upon the claims filed and the Debtors' income and expenses over the life of the Plan, the nonpriority unsecured creditors may receive a minimal distribution. The amount of sales and other taxes to be paid by Mr. McDonald's business may also affect the Plan funding.[5] *See* Debtors' Brief.

4. Mr. McDonald explained that early in 2003, after a change in the account of one of his major customers, that customer ceased to direct pay the sales taxes due to the State of Ohio. This error was not caught until 2006, resulting in significant tax liability for Mr. McDonald's former business, Specialized Investigations, Inc. He also testified that his existing business, Security Group of North America, Inc., also currently owes sales taxes to the State of Ohio that remained unpaid as a result of the business' financial difficulties.

5. As noted below, the Debtors' Plan has two conflicting provisions concerning the payment of the sales taxes: 1) the treatment provided for Class 3 priority tax claims under the Plan as part of section 5 on page 8 provides for payment of the priority tax claims in accordance with the requirements of the Code, i.e. in full in deferred cash payments over the life of the Plan; and 2) the Special Plan Provisions on page 14 of the Plan provides that: "The Sales Tax owed to the State of Ohio by Specialized Investigations listed on Schedule E will be paid outside the Plan by the Corporation. Accordingly, Debtor shall treat this debt as a Class 7 Claim and neither the Plan nor Debtor shall make any payments on this debt." The portion, if any, of the sales taxes incurred by Mr. McDonald's businesses that will be paid by Security Group of North America, Inc. is unclear and at this point, mostly speculative. To the extent such taxes are paid by Security Group of North America, Inc., more money should be available to pay nonpriority unsecured creditors.

The Debtors, counsel for the Debtors, counsel for ODT, counsel for KHN, and counsel for the Trustee attended the Hearing. Both Mr. and Ms. McDonald testified and the court finds that their testimony was credible. In accordance with the order entered on June 9, 2010 (Doc. 37), the Trustee, the Debtors, and ODT filed their post-hearing briefs (Docs. 46, 48, and 49).

## B. Positions of the Parties

The Trustee Objection is based on the allegation that the Plan has not been proposed in good faith under 11 U.S.C. § 1325(a)(3),[6] and asserts that the "Debtors are proposing to keep their house valued at $365,000.00 at $2,325.00 per month in a 0% plan[,] . . . have gross income of $18,951.00 per month and proposing a 0% plan [and] . . . provide for payment of luxury personal property not necessary for the maintenance and support of Debtors' dependant(s): Debtors are proposing to keep and pay $38,000.00 for a 2007 Denali in a 0% plan." In addition to the good faith issue, the Trustee also argues that the Debtors failed to comply with 11 U.S.C. §§ 1325(a)(9)[7] and 1308 concerning the filing of tax returns. *See* Trustee's Brief.

ODT objects to the Plan because it proposes to pay the sales taxes owed by Mr. McDonald and his businesses outside the Plan through "the Corporation." As noted in the ODT Brief, the Debtors' counsel "verbally committed to an Agreed Order allowing the Department of Taxation's priority claims to be paid inside the Plan;" however, "Debtors' Brief now requests the Court overrule the Department of Taxa-tion's objection to Debtors' Ch 13 Plan" and no agreed order concerning treatment of the Ohio Department of Taxation's claims has been submitted to the court. *See* ODT Brief, p. 2.

The KHN Objection relates to KHN's financing of Ms. McDonald's purchase of the BMW and appears to have been resolved through the agreement reached between KHN and the Debtors that the value of the vehicle exceeds the balance owed on the loan and, therefore, cannot be crammed down to some lower number. KHN did not file a post-hearing brief on the confirmation issues.

The Debtors maintain that their Plan has been proposed in good faith, pointing out that they traded in two vehicles and purchased the used Denali, resulting in a smaller monthly vehicle expense and that they entered into the mortgage modification with Fifth Third Bank, resulting in a lower monthly payment on that second mortgage loan during the life of the Plan. The Debtors posit that these measures reflect their sincere effort in "belt tightening" and allow more money to be paid to their unsecured creditors under the Plan. The Debtors also point out that they are a family of six, with four dependent minor children, and, therefore, the Denali is necessary for transportation of the family, in addition to Mr. McDonald's business uses, and sale or surrender of the family residence would negatively impact the minor children. Finally, the Debtors state that:

> The Debtors' actual living budget by counsel's calculations is $3,196.00 per month for a family of six. Even by the Trustee's own chart he would allow

---

**6.** The Trustee's Objection did not raise 11 U.S.C. § 1325(a)(7) requiring that a petition be filed in good faith, a confirmation requirement added as part of the enactment of the Bankruptcy Abuses Prevention and Consumer Protection Act of 2005.

**7.** Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101–1532 (the "Code"), cited hereinafter in this decision as "§ ——".

$3,200.00 per month. However the Trustee's chart for families of this size appears to be inaccurate. If the internal Revenue Service standards were followed by counsel's calculations the Debtors would be permitted a living budget of $3,716.00 per month. The Debtors would therefore respectfully submit that they are actually living on a budget that is less than the standard.

Debtors' Brief, p. 2. With respect to the ODT Objection, the Debtors assert that the treatment provided for Class 3 priority tax claims under the Plan as part of section 5 on page 8 provides for payment of the priority tax claims in accordance with the requirements of the Code and, therefore, the ODT Objection should be denied.

## III. Legal Analysis

### A. Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

### B. The Burdens With Respect to an Objection to Confirmation

■ The objecting party has the initial burden to produce evidence in support of an objection. *In re Henry*, 328 B.R. 529, 538 (Bankr.S.D.Ohio 2004). The Debtors have the ultimate burden of proof to show the requirements of 11 U.S.C. § 1325 have been met. *Id.; In re Hogue*, 78 B.R. 867, 872 (Bankr.S.D.Ohio 1987); *In re Carver*, 110 B.R. 305, 311 (Bankr. S.D.Ohio 1990) (Cole, J.). *See also Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir.1990) ("*Caldwell II*"); *Ed Schory & Sons, Inc. v. Francis (In re Francis)*, 273 B.R. 87, 91 (6th Cir. BAP 2002).

### C. Kettering Health Network's Objection Concerning the BMW

As noted above, the issues raised by the KHN Objection appear to have been resolved through the agreement reached between KHN and the Debtors that the value of the vehicle exceeds the balance owed on the loan. To the extent KHN continues to object to confirmation of the Plan, it appears that it is raising the same issues as the Trustee Objection and, therefore, the court will address those issues through the court's determination of the Trustee Objection.

### D. Ohio Department of Taxation's Objection

■ The Plan contains two conflicting provisions concerning the payment of the sales taxes: 1) the treatment provided for Class 3 priority tax claims under the Plan as part of section 5 on page 8 provides for payment of the priority tax claims in accordance with the requirements of the Code, i.e. in full in deferred cash payments over the life of the Plan; and 2) the Special Plan Provision on page 14 of the Plan which states that:

> The Sales Tax owed to the State of Ohio by Specialized Investigations listed on Schedule E will be paid outside the Plan by the Corporation. Accordingly, Debtor shall treat this debt as a Class 7 Claim and neither the Plan nor Debtor shall make any payments on this debt.

Counsel for ODT and the Debtors informed the court at the time of the Hearing that they had reached an agreement pursuant to which the Debtors would pay their tax arrearages through the Plan, and that an agreed order between the parties was to be submitted to evidence that agreement. The Debtors' Brief also appears to take the position that the taxes due to the State of Ohio will be paid through the Plan in deferred installments

over the life of the Plan. However, as of this date, the agreed order has not been submitted, nor has the Plan been amended concerning treatment of the taxes due to Ohio.

Since the Plan has not been amended and no agreed order concerning the treatment of the Ohio sales taxes has been entered, the court must deny confirmation of the Plan. Section 1322(a)(2) requires the payment of all priority tax claims within the Plan over the life of the Plan in deferred installments unless the holder of such claim agrees otherwise. The Plan, as currently drafted provides for the payment of the sales taxes outside the Plan and ODT has objected to that treatment. The Special Plan Provision contravenes § 1322(a)(2) and the Plan cannot be confirmed. While the statements of their counsel at the Hearing and their Brief appear to reflect the Debtors' agreement that these taxes must be paid through the Plan, the Plan has not been amended to delete the Special Plan Provision concerning the sales taxes and the court cannot confirm the Plan with that provision in the Plan absent the consent of ODT.

### E. The Trustee's Objections

#### 1. *Debtors' Compliance With §§ 1325(a)(9) and 1308*

The Trustee Objection did not address the Debtors' failure to file their 2009 tax returns pursuant to §§ 1325(a)(9) and 1308 prior to the creditors' meeting scheduled pursuant to § 341. *See* Trustee Objection. Nor did the Trustee or any other party introduce evidence at the Hearing concerning compliance or noncompliance with §§ 1325(a)(9) and 1308.

There are conflicting statements in the parties' briefs as to whether the 2009 tax returns were filed. The Trustee states that:

The IRS proof of claim also indicates that the debtors have not filed their 2009 tax returns (listed as unassessed in the claim attachment). The Trustee's office received a letter from the IRS also indicating that the debtors have not filed their 2009 taxes. Unfortunately this letter has been destroyed to protect the debtors' privacy per the Chapter 13 Trustee's policy.

Trustee's Brief, p. 4. However, the Debtors state that "[t]he 2009 personal income tax return indicates that Mr. McDonald's dividends from his corporation were $68,382.00 or $5,698.50 per month," seemingly inferring that their 2009 income tax return was filed. *See* Debtors' Brief, p. 5.

Because the Trustee did not raise this issue in the Trustee Objection and did not introduce evidence at the Hearing on that issue, the court has no basis to deny confirmation of the Plan based upon §§ 1325(a)(9) and 1308. The Trustee, as the objecting party, had the initial burden of producing evidence in support of his objection. *See Henry,* 328 B.R. at 538. The court finds that he did not meet that burden. Accordingly, the Trustee's objection to confirmation of the Plan based upon §§ 1325(a)(9) and 1308 is denied.

#### 2. *Whether the Plan Was Proposed in Good Faith*

The Trustee and KHN assert that the Plan should not be confirmed because it was not proposed in good faith. Section 1325(a)(3) specifically provides that "the court shall confirm a plan if . . . the plan as been proposed in good faith and not by any means forbidden by law." The court finds that the Trustee met his initial burden of producing evidence in support of his objection, and that the Debtors did not sustain their ultimate burden of proving, under the totality of the circumstances, that the Plan was proposed in good faith.

### a. Sixth Circuit Law Regarding the Good Faith Requirement of § 1325(a)(3)

 The Bankruptcy Appellate Panel for the United States Court of Appeals for the Sixth Circuit summarized the Sixth Circuit's good faith decisions in *In re Francis*, 273 B.R. 87 (6th Cir. BAP 2002). The Sixth Circuit has indicated that "a debtor's pre-petition conduct is but one element" and that bankruptcy courts must look to the totality of the circumstances in determining a debtor's good faith in filing a chapter 13 petition and plan. *Metro Emps. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah )*, 836 F.2d 1030, 1033 (6th Cir.1988). In *Caldwell II*, the Sixth Circuit set forth a twelve-part test to determine whether a debtor's Chapter 13 plan was proposed in good faith:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increase in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment within classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and,

(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*Caldwell II*, 895 F.2d at 1126–27. The *Caldwell II* factors merely serve as guidelines for determining good faith. *In re Sharon*, 200 B.R. 181, 196 (Bankr.S.D.Ohio 1996). A good faith determination is not simply a matter of counting the factors favoring good faith and numerically weighing them against those factors indicating a lack of good faith. *In re Gelvin*, 1994 Bankr.LEXIS 1978 (Bankr.S.D.Ohio Nov. 23, 1994). "[C]lose proximity in time between a debtor's purchase of collateral and the filing of a Chapter 13 may evidence a lack of good faith." *Henry*, 328 B.R. at 539 (internal citations omitted). Moreover, good faith does not necessarily require a substantial payment to unsecured creditors. *Francis*, 273 B.R. at 92. In summarizing the § 1325(a)(3) good faith analysis, the Sixth Circuit stated that:

Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision

should be left simply to the bankruptcy court's common sense and judgment.

*Okoreeh–Baah,* 836 F.2d at 1033.

■ The totality of the circumstances test set forth in *Caldwell II* and expounded upon in *Okoreeh–Baah, Francis* and their progeny requires analysis of both the subjective good faith and the objective good faith of debtors. Thus, factors 4, 7, 9, 10 and 12 have at least some element of scienter relating to assessing a debtor's motive, intent, and conduct in pursuing a Chapter 13 plan. The other factors are more focused on an objective analysis of the plan—that is, the fundamental fairness of the plan, whether it achieves the purposes of the Code and particularly Chapter 13, and the probability that the plan will be successful.

In several different decisions, the Northern District of Illinois has recognized the distinction between "subjective" and "objective" good faith relating to Chapter 11 and Chapter 13 cases. Thus, in *In re Mandalay Shores Coop. Hous. Assoc., Inc.,* 63 B.R. 842, 847–48 (N.D.Ill.1986), United States District Judge Milton I. Shadur stated:

> Of course the term "good faith" can be defined in several ways, and its legal significance depends on its legal context. Frequently a distinction is made between "subjective" and "objective" good faith, the former indicating an individual's actual state of mind and the latter a reasonable person's hypothetical state of mind in given circumstances. Subjective good faith without its objective counterpart is often called the "pure heart—empty head" phenomenon [citation omitted].
>
> Perhaps one reason Congress took the term "good faith" out of Section 1112(b) was to avoid the confusion created by intertwining subjective and objective inquiries. It may easily happen a corporation will argue it filed a petition with a pure heart, but the creditors will argue the petition was filed with an empty head. . . .
>
> * * * *
>
> But mere obedience to court orders—important though that is—cannot salvage a merit less action. And what goes under the name of an "objective good faith" inquiry under Chapter 11 really amounts to analysis of the merits of the debtor's claim of entitlement to reorganization. Most of Chapter 11 deals with the mechanics of a reorganization, assuming that form of relief is appropriate. Section 1112(b) and its associated "good faith" doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score dismissal of a Chapter 11 petition—like dismissal of any lawsuit—is not imposed principally as a sanction for bad intentions or obstreperous behavior. Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks.

Further refining this distinction, the court in *In re McCormick Road Assocs.,* 127 B.R. 410, 415 (N.D.Ill.1991), stated:

> As the court in *California Sound Systems* [69 Bankr.893, 901 (Bankr.S.D.Cal. 1987)] observed, "the appellation 'bad faith filing' is perhaps a misnomer in that it implies the existence of ill will or malicious conduct on the part of debtor prior to filing for relief." 69 Bankr.at 901 n. 2. In the Northern District of Illinois the determination of whether a bankruptcy petition is filed in good faith is made by an analysis of objective standards geared toward evaluating "whether reorganization is the proper course of action in a particular debtor's case." *In re Mandalay Shores Cooperative Housing Assoc., Inc.,* 63 Bankr.842, 848

(N.D.Ill.1986). A dismissal under this criterion is by no means synonymous with a finding that a case was filed with intent to harass a creditor.

*See also Elmwood Dev't Co. v. General Elec. Pension Trust (In re Elmwood Dev't Co.)*, 964 F.2d 508, 512 (5th Cir.1992) ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to testimony of the subjective state of mind of Elmwood's manager.") and *In re Tillotson*, 266 B.R. 565, 571–72 (Bankr.W.D.N.Y. 2001) (Second Chapter 11 case was an "impermissible effort to modify the prior plan ... and without 'objective' good faith in the form of 'fundamental fairness.' "). In *McCullough v. Brown*, 162 B.R. 506, 510 (N.D.Ill.1993), an appeal involving treatment of unsecured student loan obligations in Chapter 13 plans, Judge Shadur referenced the "objective good faith" and fundamental fairness concepts involved in assessing Chapter 13 plans.

The concept of a Chapter 13 case and a Chapter 13 plan being filed in "objective good faith" has been more recently discussed in the context of motions to extend the automatic stay under § 362(c)(3)(B) and to impose a stay under § 362(c)(4).[8] In *In re Ferguson*, 376 B.R. 109, 122–23 (Bankr.E.D.Pa.2007), the court addressed the good faith issue under § 362(c)(3) and (4) and after surveying cases from other jurisdictions, concluded that "the courts have devised various 'checklists' of good faith factors" and then listed 14 such factors. Those 14 factors are essentially the *Caldwell II* factors with two additional ones. The court then noted that a couple of the factors relate to the debtor's subjective good faith, but that most of them relate to the debtor's objective good faith. *Id.* at 124, n. 27. *See also In re Thornes*, 386 B.R. 903, 910–11 (Bankr.S.D.Ga.2007) ("Having a case dismissed and then refiled due to attorney error certainly supports the notion that Debtor has no subjec-

---

8. Section 362(c)(3), in pertinent part, states: (3) if a single or joint case is filed by or against debtor who is an individual in a case under chapter 7, 11, or 13 ... and if a single or joint case of the debtor was pending within the preceding 1–year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b) [11 USCA § 707(b) ]—

(A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30–day period **only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed** ...

11 U.S.C. § 362(c)(3) (emphasis added). Section 362(c)(4), in pertinent part, states:

(4) (A)(i) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under section 707(b) [11 USCA § 707(b) ], the stay under subsection (a) shall not go into effect upon the filing of the later case; and

(ii) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

(B) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, **only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed** ...

11 U.S.C. § 362(c)(4) (emphasis added).

tive bad faith or malice, but even assuming that Debtor has good faith motives and a sincere intent to repay his creditors, he must first prove that [his third case] meets the objective good faith standard in order to gain the benefit of the automatic stay.").

Accordingly, determination of the Debtors' good faith in proposing the Plan as required under § 1325(a)(3) entails an analysis of the totality of the circumstances of the Plan, with particular attention paid to the factors set forth in *Caldwell II*. Further, while the Plan may have been filed with all of the right motives and intent—that is in subjective good faith, it still may not pass muster under *Caldwell II*, *Okoreeh–Baah*, and *Francis* if it can not survive scrutiny under the objective good faith factors set forth in those cases, paying particular attention to whether it is fundamentally fair, achieves the purposes of the Code and particularly Chapter 13, and will likely be successful.

### b. Analysis of the Good Faith Factors and Issues

■ The Trustee admits that the Debtors and the Debtors' Plan satisfy many of the *Caldwell II* factors. *See* Trustee's Brief, pp. 7, 10, and 11. The Debtors are dedicating all of their disposable income as reflected by Schedules I and J to the Plan;[9] the commitment period of the Plan is 60 months, and therefore, cannot be

longer; there is no suggestion that the Debtors have not been honest in representing their financial circumstances; the secured claims are not modified except for Fifth Third's second mortgage loan by agreement; the Debtors have not filed for bankruptcy protection previously; and, the administration of the Plan will not impose any unusual burden on the Trustee.

The Trustee focuses his good faith argument on the Debtors' budget. Simply put, the Trustee argues that the Debtors' residence and vehicles are too expensive and the Debtors' failure to shed those items and replace them with less expensive ones establishes their lack of good faith in proposing the Plan. Thus, the Trustee concludes that the Debtors have failed to engage in sufficient belt-tightening so as to free up more money for unsecured creditors, choosing instead to continue a better lifestyle than appropriate under their current circumstances at the expense of their unsecured creditors.

A substantial body of case law exists to support the Trustee's argument, including within this district. As noted by the Trustee, Judge Preston in the *Reid* decision found a Chapter 13 plan was not proposed in good faith when the two debtors owned a house valued at $470,000 and owed 147,-479 in taxes and only proposed to pay 3% to their nonpriority unsecured creditors.

---

9. The Debtors are above-median income debtors for the State of Ohio. No issue has been raised as to the Debtors not committing all of their projected disposable income to make payments to unsecured creditors as is required under § 1325(b)(1)(B) when a confirmation objection is filed by the Chapter 13 Trustee or the holder of an allowed unsecured claim. Both the Trustee and the Debtors relied on the Debtors' actual income and expenses at confirmation as reflected by Schedules I and J to determine disposable income and projected disposable income, which varied greatly from those set forth on the Debtors' Official Form 22C (Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income). The court is not opining on whether such complete reliance on Schedules I and J to determine a debtor's disposable income and projected disposable income is appropriate. *See Hamilton v. Lanning*, —— U.S. ——, 130 S.Ct. 2464, 2478, 177 L.Ed.2d 23 (2010) ("[W]e hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation.").

*In re Reid,* 2007 Bankr.LEXIS 4724 (Bankr.S.D.Ohio March 9, 2007). In *Henry,* Judge Hoffman remarked that the "Debtor's monthly Plan payment of $560 could be raised significantly if he reduced his monthly housing cost ($1,063) and his food budget ($430), both of which seem excessive for a single person with no dependents living in Grove City, Ohio." *Henry,* 328 B.R. at 543. Judge Aug has issued a series of decisions granting the United States Trustee's motions to dismiss or convert Chapter 7 bankruptcy cases under circumstances in which he found that the debtors were living too lavishly to justify a discharge of all of their nonpriority unsecured creditors. *See In re dePellegrini,* 365 B.R. 830 (Bankr.S.D.Ohio 2007) (debtor wished to give his two adult sons the same lifestyle they had before debtor's divorce); *In re Robert,* 384 B.R. 777, 780 (Bankr.S.D.Ohio 2008) (abuse found where debtors chose to earn less than full earning capacity and keep expensive home); and *In re Dupuy,* 433 B.R. 226 (Bankr. S.D.Ohio 2010) (court found that the debtor and his non-debtor wife should not retain a $400,000 house at a monthly cost of $2,500 at the expense of the debtor's unsecured creditors).[10]

The court finds that the Trustee and KHN met their burden of producing evidence in support of their objection that the Plan was not proposed in good faith. The undisputed evidence reflects that the Debtors own a $365,000 house with about $358,000 in secured debt attached to it, two vehicles with secured debt totaling $53–54,000 and, in addition own a Harley Davidson motorcycle free and clear of liens that has not been sold, have a combined monthly gross income of approximately $19,000, and are proposing to pay either a 0% dividend or a minimal dividend to nonpriority unsecured creditors. The Debtors' testimony and the court's taking judicial notice of the Debtors' Schedules (A–J) and Statement of Financial Affairs (Doc. 1) support the Trustee's Objection and constitute sufficient evidence to raise a good faith issue under § 1325(a)(3). Accordingly, the Debtors bore the ultimate burden of proving their good faith. *Caldwell II,* 895 F.2d at 1126; *Francis,* 273 B.R. at 91.

█ The Debtors did not sustain their burden of proving that their Plan was proposed in good faith. Specifically, the court finds that if the Plan is confirmed, "the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources" will not be satisfied. *Okoreeh–Baah,* 836 F.2d at 1033. The primary area of dispute over confirmation does not concern the Debtors' subjective good faith, but rather, the objective good faith of the

---

**10.** Cases outside this district finding Chapter 13 plans could not be confirmed because of too much secured debt include: *In re Loper,* 367 B.R. 660 (Bankr.D.Colo.2007) (plan not proposed in good faith when it proposes to commit two-thirds of the debtors' income ($5,690 monthly) to keep a 3,000 square foot home valued at $670,000 in which they will have little or no equity); *In re Leone,* 292 B.R. 243 (Bankr.W.D.Pa.2003) (plan not proposed in good faith when nonpriority unsecured creditors would only receive an 11% dividend and the debtors proposed paying more than $205,000, at a monthly cost of $2,347.88, for a house valued at $138,000); *In re Namie,* 395 B.R. 594 (Bankr.D.S.C.2008) (plan not proposed in good faith when it proposed to pay nonpriority unsecured creditors a 1% dividend over 57 months and devote nearly 75% ($5,376.54 monthly) of his household income to maintaining and curing his mortgage payment on a home valued at approximately $500,000); and *In re Stitt,* 403 B.R. 694 (Bankr.D.Idaho 2008) (plan not proposed in good faith when debtor sought to retain his house and acreage valued at $305,000 with monthly expenses in excess of $2,300, which would require him to pay more than four times the IRS allowable housing expense for a single person in the county).

Plan.[11] An analysis of the economic impact the of the Plan—payment of the secured debt on the home and cars and the priority taxes, while discharging the nonpriority unsecured debt—reveals that the Debtors' Plan is truly a "veiled" Chapter 7 plan. "Courts should not approve Chapter 13 plans which are nothing more than 'veiled' Chapter 7 plans." *Caldwell II*, 895 F.2d at 1126, citing *In re Girdaukas*, 92 B.R. 373, 377 (Bankr.E.D.Wis.1988). In essence, the Plan reaffirms the secured debt on the Debtors' high-end home and cars and the tax liability for which Mr. McDonald is personally obligated, at the expense of the Debtors' nonpriority unsecured creditors who receive nothing. As noted above, a small dividend does not mandate the conclusion that a plan was filed in bad faith. *Francis*, 273 B.R. at 91. Zero or small dividend Chapter 13 cases are frequently filed and confirmed by this and other courts. However, in this case, the Debtors receive a monthly gross income of approximately $19,000. The Chapter 13 cases with confirmed plans involving zero or minimal dividends to nonpriority unsecured creditors involve homes worth significantly less than $365,000, secured debt on vehicles less than $53,000, and monthly incomes far lesser than $19,000. Not only are the Debtors proposing to retain their house and cars, but they also intend to keep Ms. McDonald's Harley Davidson motorcycle. "A Chapter 13 debtor who is not able to pay [his or her] creditors in full is generally expected to demonstrate a degree of belt tightening and this may require some sacrifices." *In re Jones*, 119 B.R. 996, 1000 (Bankr.N.D.Ind.1990) (citation omitted); *In re Gibson*, 142 B.R. 879, 882 (Bankr.E.D.Mo.1992). While most of the evidence reflects positively on the Debtors' subjective good faith, the unfairness of the Plan as relates to the assets that the Debtors are retaining and the treatment of the nonpriority unsecured creditors, not only evidences a lack of objective good faith, but also raises some issue as to their subjective good faith.

■ While the Debtors offered some justification for retention of their residence,[12] they failed to introduce any evidence as to the reasonableness of their housing costs. The Debtors seem to rec-

---

**11.** There is significant evidence supporting a finding that the Debtors filed their case and proposed their Plan in subjective good faith: a) there was no evidence of deceit, manipulation, or other bad acts which tainted their case or Plan; b) the Debtors refinanced the second mortgage to lower the payments on that loan during the life of the Plan; c) the Debtors traded in two motor vehicles for one, resulting in a net lower vehicle expense; d) the cause of the bankruptcy was not inordinate spending on credit cards or other unsecured debt; and e) Mr. McDonald acquired and owned the house that serves as their residence some time before all of these problems arose and, thus, the Debtors' need to file a Chapter 13 was not due to acquiring a house that was unaffordable at the time it was purchased.

**12.** The evidence establishes that the Debtors have four minor children. With respect to retention of the house, the Debtors' Brief states: "There is absolutely no evidence in this case that the Debtors could even find another property to rent in the children's current school district, so if the Trustee's demands are followed, we have no idea what the consequences will be for this family. They certainly will not be good. Under the totality of the circumstances of this case the Debtors should be permitted to keep their home for the benefit of their children. To do otherwise would be to punish the children for the mistakes of the parents." Debtors' Brief, p. 3. However, no evidence of special circumstances necessitating the Debtors' retention of this particular house was introduced, such as there being a handicapped individual in the family and the home being specially constructed to provide access for such individual.

ognize the importance of such evidence on page 2 of their brief where they state:

Frankly, the Trustee's characterization of the Debtors' budget as slightly higher than normal is in the opinion of counsel incorrect. The Debtors' actual living budget by counsel's calculations is $3,196.00 per month for a family of six. Even by the Trustee's own chart he would allow $3,200.00 per month. However the Trustee's chart for families of this size appears to be inaccurate. If the [I]nternal Revenue Service standards were followed by counsel's calculations the Debtors would be permitted a living budget of $3,716.00 per month. The Debtors would therefore respectfully submit that they are actually living on a budget that is less than the standard.

The Debtors' reference to the Internal Revenue Service standards is to the National Standards and Local Standards issued by the Internal Revenue Service for the area in which the debtor resides. *See* 11 U.S.C. § 707(b)(2)(A); *Voelkel v. Naylor (In re Voelkel)*, 322 B.R. 138, 147–48 (9th Cir. BAP 2005);[13] *In re Wadsworth*, 383 B.R. 330, 335 (Bankr.N.D.Ohio 2007); *In re Littman*, 370 B.R. 820, 827 (Bankr.D.Idaho 2007); and *In re Ruel*, 418 B.R. 389, 392 (Bankr.D.N.M.2009).[14] However, the Debtors did not introduce any such evidence. Rather than producing such evidence, the Debtors sought to shift their burden to show good faith to the Trustee, stating: "[t]here is absolutely no evidence in this case that the Debtors could even find another property to rent in the children's current school district...." Debtors' Brief, p. 3. After coming forward with some evidence to support his objection to the Debtors' retention of their house, it was not the Trustee's ultimate burden to show lack of good faith, it was the Debtors' burden to establish subjective and objective good faith.

Similarly, while the Debtors introduced evidence to justify the acquisition and retention of their vehicles,[15] they did not

**13.** In *Voelkel v. Naylor (In re Voelkel)*, 322 B.R. 138, 147–48 (9th Cir. BAP 2005) the court explained that it is appropriate for a court to rely on its own value judgments to determine the reasonableness of a debtor's expenses when the court is sua sponte moving to dismiss a debtor's Chapter 7 case for abuse because the court has no way of gathering or admitting evidence, provided that the court "s et forth all issues to be considered at the section 707(b) hearing" so that the debtor has an opportunity to contradict the court's findings with evidence. In this case, the court is not the moving nor objecting party and, therefore, it need not solely rely on its own value judgments, but may instead appropriately rely on the evidence presented by the parties and the respective burdens of the parties.

**14.** For Chapter 13 cases applying these standards in this district *see In re Kolb*, 366 B.R. 802, 811–12 (Bankr.S.D.Ohio 2007) and *In re Anderson*, 383 B.R. 699, 708–09 (Bankr. S.D.Ohio 2008). Of course, the approach followed in *Kolb* and *Anderson* of multiplying the disposable income determined using the means test embodied in Form 22C by the months in the applicable commitment period to calculate projected disposable income has been changed by *Lanning*. *See Hamilton v. Lanning*, —— U.S. ——, ——, 130 S.Ct. 2464, 2478, 177 L.Ed.2d 23 (2010) ("We hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."). Nevertheless, in cases such as this one in which the reasonableness of the Debtors' expenses are contested, the citations to *Kolb*, *Anderson* and other similar cases are a reminder that objective criteria, such as the IRS expense guidelines or other admissible objective evidence would provide a basis to evaluate the objective good faith of a Chapter 13 plan other than through the court's own personal experiences and knowledge.

**15.** Mr. McDonald testified that they purchased the Denali because it was large enough to accommodate both the needs of his large family and his business needs and de-

introduce evidence as to the reasonableness of their vehicle expenses. The Debtors admit that their secured debt increased by $12,000 with the purchase of the Denali "only a few months before filing" and that they owed $38,000 on this $32,000 vehicle at the time the petition was filed. Debtors' Brief, p. 4 and Schedules D and F (Doc. 1). The "close proximity in time between a debtor's purchase of collateral and the filing of a chapter 13 petition may evidence lack of good faith" in a good faith analysis under § 1325(a)(3). *Henry,* 328 B.R. at 539, *citing Sharon,* 200 B.R. at 196. *See also Okoreeh–Baah,* 836 F.2d at 1033. While the Denali was purchased to replace two vehicles and the payments on the Denali are less than the total of the payments on the two traded vehicles, the fact that this transaction resulted in an increase of $12,000 on the Debtors' secured debt is troubling. The Denali had 37,000 miles on it when it was purchased while the mini van had between 60,000 and 70,000 miles on it when it was traded in. Facing bankruptcy, retention of the mini van, even if "worn," and use of it as the family vehicle and for Mr. McDonald's limited business use, with the surrender of the third vehicle, while perhaps not the most enviable alternative, would have been the alternative resulting in a greater likelihood that nonpriority unsecured creditors would be paid some type of return. Accordingly, the court finds that this transaction does not support the Debtors' efforts to establish their good faith in proposing the Plan.

The cause of the Debtors' financial trouble as it affects the Plan provisions and impacts nonpriority unsecured creditors also negatively reflects on the objective good faith of the Plan. At first blush the

Debtors may not appear to have been living beyond their means but simply to have gotten caught in the accidental failure of Mr. McDonald's businesses to pay sales taxes. However, a more thorough examination of the situation casts doubt on that simple conclusion. While sales taxes were not being paid to the State of Ohio, Mr. McDonald took $68,382 in dividends from his company ($5,698.50 monthly). Debtors' Brief, p. 5. The Debtors' Statement of Financial Affairs reflects income to Mr. McDonald of $55,000 for 2009 from Security Group of North America, Inc. and $93,783 in 2008 from that company and Special Investigations, Inc. Had Mr. McDonald's companies paid the sales taxes and other applicable taxes during that time period, the dividends to Mr. McDonald would have been lower and, as a result, the Debtors' total income would also have been lower. *See* Debtors' Brief, pp. 4–5. Therefore, the Debtors may have been unknowingly living beyond their means. Mr. McDonald's failure to pay taxes combined with his drawing income and dividends from his companies impact the Debtors' unsecured creditors as reflected in the Plan.

As a result of the ODT Objection, substantially all of the Debtors' contributions to the Plan would fund payment of the priority taxes that Mr. McDonald's companies failed to pay while he was receiving significant dividends from those companies. Perhaps to rectify this situation, the Debtors originally proposed payment of those taxes outside the Plan. However, ODT, well within its rights, objected to this treatment and consequently, the Debtors have no choice but to pay these taxes within the Plan. Concretely, this requirement means that the Debtors' unsecured

---

pendable enough to last a long time. Both Debtors testified that they need this vehicle for family transportation, such as to transport

the children to and from their various after-school activities and church.

creditors, who receive nothing under the Plan, are in effect subsidizing the payment of Mr. McDonald's taxes. This is another reason why the Plan, as currently formulated and as would be effectuated, is fundamentally unfair to the nonpriority unsecured creditors and does not serve the goals of bankruptcy and particularly Chapter 13 of the Bankruptcy Code.

Finally, the Debtors stress that their decisions to retain their home and vehicles were made to accommodate and preserve the well-being of their family, particularly their four minor children. The court recognizes the importance of family unity and values. However, family bonds, values and education transcend houses, school district lines, and communities.[16] The unfortunate circumstances of debtors usually do impact the family unit as a whole with sacrifices having to be made by all.

### c. Summary of the Court's Findings as to Good Faith

In summary, the court finds that a critical analysis of the evidence viewed through the objective good faith factors outlined in *Caldwell II* and further discussed in *Okoreeh–Baah* and *Francis* and their progeny establishes that the Plan cannot be confirmed. Particularly, the zero or minimal dividend to nonpriority unsecured creditors (percentage of repayment consideration under the fourth *Caldwell II* factor), the retention of the high-end home and vehicles with their attendant secured claims being paid in full while the nonpri-

ority creditors receive little or nothing (*Caldwell* factors 5, 6, and 7), and the lack of evidence of any special circumstances such as major medical expenses that could have caused the Debtors' financial misfortune (contrasted with business error leading to the failure to pay taxes in this case) (*Caldwell* factor 8) convince the court that the Plan is fundamentally unfair and not objectively filed in good faith. Whether or not it is intentionally designed to be, the Plan, proposing to pay in full the Debtors' secured claims and Mr. McDonald's tax liabilities at the expense of the unsecured creditors, resembles a "veiled" Chapter 7 and raises questions as to the Debtors' sincerity and motivation in seeking Chapter 13 relief and as to whether the Debtors are attempting to abuse the spirit of the Bankruptcy Code (*Caldwell* factors 10 and 12). While the court finds that most of the facts support a finding of subjective good faith, the effect of confirming this Plan would be to abuse the spirit of the Bankruptcy Code and particularly Chapter 13.

The court does not mean to imply that the Debtors can not propose a confirmable plan. The Debtors in their brief allude to their willingness to increase their plan payments by $95.51, the amount saved by their refinancing of their second mortgage and to regularly report Mr. McDonald's income from operation of his business to adjust the Plan payment to reflect their disposable income.[17] In addition, the

---

**16.** As Judge Mullins aptly recognized in *In re Johnson*, 318 B.R. 907, 919 (Bankr.N.D.Ga. 2005), a court cannot embark upon the path of determining "where a debtor should live ... the Debtor's ability to obtain other housing, the availability of housing in a particular area, the Debtor's desire to remain in a certain school district, the type of housing available, the safety of the Debtor's neighborhood, the details of the Debtor's commute to work, [or] the Debtor's sentimental ties to the home...." However, the court can make de-

terminations of good faith based upon objective criteria and evidence.

**17.** The Debtors assert in their brief that their 2009 income tax returns indicate greater income for Mr. McDonald than that disclosed on their Schedule I. The Debtors estimate that after deduction of appropriate taxes, and assuming Mr. McDonald's income does not change from 2009, "Mr. McDonald probably has approximately $475.00 more income on the average than set forth in the schedules."

Debtors originally proposed payment of the sale taxes owed to ODT outside of the Plan. While ODT is within its rights to require payment of any priority taxes owed by either of the Debtors through the plan payments, a structure that would allow Mr. McDonald's business to pay the sales taxes, thus increasing the Debtors' disposable income to fund the nonpriority unsecured claims, would certainly be indicia of fundamental fairness. Liquidation of unnecessary assets for the benefit of nonpriority unsecured creditors could also be indicia of fundamental fairness. Thus, an amended plan could obviously alter the tenor of the Plan, the percentage dividend to nonpriority unsecured creditors and lead to a confirmable plan.

## IV. Conclusion

For the reasons set forth above, confirmation of the Plan is denied. The Debtors are granted forty-five (45) days from the date that the order on this decision is entered to file an amended plan. In the event an amended plan is not filed with that forty-five (45) day period, the case will be dismissed.

The court will enter a separate order on this decision denying confirmation with leave to file an amended plan within forty-five (45) days.

**IT IS SO ORDERED.**